**Firman COOK, et al., Appellants,**

v.

**The CITY OF ADDISON, Texas, Appellee.**

**No. 05–82–00777–CV.**

Court of Appeals of Texas, Dallas.

Aug. 10, 1983.

Rehearing Denied Sept. 8, 1983.

J. Stanley Knight, Dallas, for appellants.

Wayne O. Woodruff, C. Michael Moore, Dallas, for appellee.

Before STOREY, WHITHAM and ROWE, JJ.

WHITHAM, Justice.

Appellants, Firman Cook, Pied Real Grundstueks GMB, Three G Food Corporation and David Albert, as owners of property abutting Belt Line Road in the appellee, City of Addison, Texas, brought this suit to contest paving assessments levied by the city against each of them for the improvement of that road. All parties sought summary judgment. The trial court denied the property owners' motion for summary judgment and rendered a take nothing summary judgment in favor of the city and against the property owners. In nine points of error the property owners contend that:

> (1) the city did not have the right to assess the owners of property abutting Belt Line Road;
>
> (2) the amount of the assessment was arbitrary and capricious;
>
> (3) they were not afforded a fair and impartial public hearing on the assessments; and
>
> (4) the paving assessment with respect to Albert was incorrectly calculated.

We find no merit in any of these contentions. Accordingly, we affirm.

The city's voters approved a $13.8 million bond program which included $11.4 million generally for "street improvements." Thereafter, the city issued and sold bonds in the amount of $5.4 million which included approximately $5 million for street improvements. When the bond proceeds were received, they were placed in the city's capital improvements fund. The bonds were not sold for the specific purpose of improving Belt Line Road and the proposition passed by the voters was for "the purpose of making permanent public improvements, to wit: street improvements, including drainage and sidewalk improvements incidental thereto...." Thereafter, the city council passed an ordinance which declared the necessity for the improvement of Belt Line Road, ordered the improvements and directed the city engineer to advertise for bids and to prepare an estimate of the total cost of the improvements and the amount of such costs to be paid by abutting property owners. That ordinance provided for an assessment in accordance with the front foot plan or rule in an amount not to exceed all of the cost of constructing the curbs and gutters and an amount not exceeding nine-tenths (⁹/₁₀) of the estimated cost of the remainder of the Belt Line Road improvements. Thereafter, the city advertised for bids on the project and prepared the estimate of costs to be paid by abutting property owners. The construction contract was awarded to the H.B. Zachry Company.

Pursuant to Tex.Rev.Civ.Stat.Ann. art. 1105b (Vernon 1963 & Supp.1982–1983), the required public hearings were held. The appellants, Firman Cook, Pied Real Grundstueks GMB and Three G Food Corporation appeared before the city council and took advantage of the opportunity to be heard as afforded by Article 1105b, Section 9. The appellant Albert did not. At those hearings the city council heard presentations from the attorney for these three property owners and testimony from Cook and from a representative from Pied Real Grundstueks GMB. The property owners argued that the proposed improvements to Belt Line Road would not enhance the value of their property in excess of the amount of the assessment. The city council also heard evidence that the enhancement to the property owners' property as a result of the Belt Line Road improvements would be at least the proposed $81.00 per front foot assessment. Following the hearings, the city council passed an ordinance which closed the public hearing, overruled all objections to the assessments and levied an $81.00 per front foot assessment against all property abutting the improved portion of Belt Line Road; finding that such amount did not exceed the special benefits to the abutting properties. Further, the city council provided for certificates of special assessment to evidence the assessments and liens secur-

ing same. Construction of improvements began, and pursuant to its contract with Zachry, the city paid Zachry monthly progress payments as work was completed. The funds used for these monthly progress payments were obtained from the capital improvements fund. The improvements relative to the assessment program were satisfactorily completed and accepted by the city; paving certificates were issued to Zachry and reassigned back to the city, the present owner and holder of said certificates. As the Belt Line Road assessments were collected, they were deposited into a special assessments fund. These monies were then credited to the capital improvements fund for the purpose of repaying that fund for monies temporarily advanced to the Belt Line Road project to enable the city to go forward with the project, pay Zachry monthly progress payments and repurchase the paving certificates from Zachry.

*The Right to Assess*

In their first four points, the property owners contend that the city did not have the right to assess because (1) of the city's use of general street improvement bond proceeds, (2) application of the front foot plan or rule would be arbitrary and capricious and (3) the evidence establishes that the assessments were intended by the city for use in improving other streets in the city.

First, we consider the city's use of general street improvement bonds. The property owners assert that the city cannot assess a portion of the costs against the abutting property owners because the city used general street improvement bond proceeds to pay for the improvements during the construction phase. Relying on four cases, the property owners argue that it was never the intention of the city to pay for any part of the improvements through assessments of abutting property owners because the summary judgment proof conclusively shows that the city intended to pay for the improvements through the proceeds of the sale of bonds and money received from the

county. *Bush v. City of Denton,* 284 S.W. 251 (Tex.Civ.App.—Ft. Worth 1926, writ ref'd); *Celaya v. City of Brownsville,* 203 S.W. 153 (Tex.Civ.App.—San Antonio 1918, writ ref'd); *Alford v. City of Dallas,* 35 S.W. 816 (Tex.Civ.App.1896, no writ); *City of Dallas v. Ellison,* 30 S.W. 1128 (Tex.Civ. App.1895, writ ref'd). Each of the cases relied on by the property owners was decided prior to the enactment of Article 1105b and none discusses the power of a home rule city to make an assessment of a portion of the costs against the abutting property owners. Accordingly, we conclude that they are not applicable in the present case.

■■■ The city asserts that, as a home rule city, it has the power to pay for street improvements with other available municipal funds (the proceeds of street improvement bonds) and then reimburse itself by thereafter imposing paving assessments under Article 1105b. We agree. The city is incorporated as a home rule city under Art. XI, Section 5 of the Constitution of the State of Texas. The city charter expressly authorizes the city council to exercise exclusive domain, control and jurisdiction over the public streets and to provide for street improvements by special assessment as provided in Article 1105b. It is established that:

A home rule city derives its power not from the Legislature but from Article XI, Section 5, of the Texas Constitution. Accepting cities and towns of more than 5,000 population have "full power of self-government, that is, full authority to do anything the legislature could theretofore have authorized them to do. The result is that now it is necessary to look to the acts of the legislature not for grants of power to such cities, but only for limitations on their powers."

*Lower Colorado River Authority v. City of San Marcos,* 523 S.W.2d 641, 643 (Tex.1975). Thus the city has full power of local self-government, subject to the limitation that its charter and ordinances shall contain nothing inconsistent with the Constitutions of the United States and the State of Texas or with the general laws enacted by the

Legislature; however, the intention of the Legislature to impose such limitations must "*appear with unmistakable clarity.*" *Id.* at 645 (emphasis added). Therefore, the city's actions in connection with the financing, construction and assessment of the Belt Line Road improvements would be within the scope of its lawful powers unless the property owners can establish that the city somehow acted inconsistently with the Constitutions of the United States or the State of Texas or the statutes of the State of Texas. The property owners do not direct this Court to any constitutional or statutory limitations which, with "unmistakable clarity," prohibit the city from financing, constructing and assessing street improvements by the method employed in the present case. To the contrary, Article 1105b, provides in pertinent part as follows:

Sec. 3. That the governing body of any city shall have power to determine the necessity for, and to order, the improvement of any highway, highways, or parts thereof within such city, and to contract for the construction of such improvements in the name of the city, and to provide for the payment of the cost of such improvements by the city, or partly by the city and partly by assessments as hereinafter provided.

\* \* \* \* \* \*

Sec. 6. Subject to the terms hereof, the governing body of any city shall have power by ordinance to assess all the cost of constructing, reconstructing, repairing, and realigning, curbs, gutters, and sidewalks, and not exceeding nine-tenths of the estimated cost of such improvements, exclusive of curbs, gutters, and sidewalks, against property abutting upon the highway or portion thereof ordered to be improved, and against the owners of such property, and to provide the time, terms, and conditions of payment and defaults of such assessments, and to prescribe the rate of interest thereon not to exceed eight (8) per cent per annum. Any assessment against abutting property shall be a first and prior lien thereon from the date improvements are ordered, and shall

be a personal liability and charge against the true owners of such property at said date, whether named or not. The governing body shall have power to cause to be issued in the name of the city assignable certificates in evidence of assessments levied declaring the lien upon the property and the liability of the true owner or owners thereof whether correctly named or not and to fix the terms and conditions of such certificates....

\* \* \* \* \* \*

Sec. 9. [T]he governing body shall have power to ... determine the amounts of assessments and all other matters necessary, and by ordinance to close such hearing *and levy such assessments before, during or after the construction of such improvements, but no part of any assessment shall be made to mature prior to acceptance by the city of the improvements for which assessment is levied.* [emphasis added].

\* \* \* \* \* \*

Sec. 13. In case any assessment shall for any reason whatsoever be held or determined to be invalid or unenforceable, then the governing body of such city is empowered to supply any deficiency in proceedings with reference thereto and correct any mistake or irregularity in connection therewith, and at any time to make and levy reassessments after notice and hearing as nearly as possible in the manner herein provided for original assessments....

We conclude that Article 1105b does not contain any limitations which, with "unmistakable clarity," prohibit the city from paying for improvements with other available city funds and still recovering a portion of the costs of the improvements by assessment. To the contrary, Article 1105b specifically contemplates that the city has such power by its very language. Section 9 *prohibits* the city from *collecting* any assessments until *after* the project is completed and accepted. Under the property owners' restrictive theory, a city would have to violate this provision of Article 1105b in order to pay the paving contractor directly with

assessment proceeds during the course of construction. Further, Section 9 clearly contemplates that the *levy* of assessments may come "before, during or after" the actual construction of the improvements. Section 3 evidences the legislature's grant of flexibility to cities to contract for street improvements and to use city monies to pay the contract and also conduct an assessment program. Finally, Section 13 allows the city to make and levy reassessments "[i]n case any assessment shall for any reason whatsoever be held or determined to be invalid or unenforceable...." Certainly, when a city seeks to reassess the abutting property owners as a result of some irregularity, such as improper notice, the improvements will have already been completed and paid for with other available city funds. Such reassessment procedures are necessarily designed to allow a city to recoup a portion of cost of the improvements *after* they have been completed and paid for with other available funds. If a city were forced to always pay the contractor directly and immediately with assessment proceeds or forfeit its right to assess, then many of the provisions of Article 1105b would be entirely meaningless.

We find *Vogel v. Central Texas Securities Corp.*, 62 S.W.2d 243 (Tex.Civ.App.— Austin 1933, writ ref'd), instructive. In *Vogel,* Central Texas brought an action against Vogel on two Article 1105b paving certificates which had been issued by the City of Rockdale to its paving contractor, which certificates were assigned back to the city and then assigned by the city to Central Texas. Vogel refused to execute a mechanic's lien on his abutting homestead property to secure the cost of the paving and the contractor notified the city that because of such refusal, he would skip the portion of the street abutting Vogel's property. The city, desiring the street to be completely paved, agreed that it would, upon completion of the work, issue paving certificates in compliance with Article 1105b, immediately have the certificates reassigned to the city, pay the contractor for the paving with other available municipal funds and then proceed against Vogel to

collect on the certificates so as to reimburse the city. The paving was done on this basis and the city thereafter assigned its rights against Vogel to Central Texas. The thrust of Vogel's argument, like that of the property owners in the present case, was that the city did not have the power to pay the contractor for the paving and still levy and collect a paving assessment from abutting property owners. *Id.* at 245. In affirming the trial court's holding in favor of the paving certificate holder, the court held as follows:

> *We do not regard the agreement of the city to pay for the paving when the contractor completed same under his contract and assigned the assessment certificates to be issued to it, the city to proceed against the abutting owner of the homestead property personally for the assessments legally made against him, as being transactions ultra vires of the city's corporate powers....* The certificates were legal and negotiable in the hands of the contractor, and no good reason exists under the facts above stated why the city, in order to secure the paving of its entire street without skips, could not agree to pay the contractor for his work upon his assigning the certificates to it, the city to proceed against appellant personally to collect the legal assessments against him for his part of the street improvements abutting on and benefiting his property. Nor do we regard the purchase of the paving certificates which appellant personally owed under the facts stated, by the city, or its subsequent assignment of them to appellee, as being transactions ultra vires of its corporate powers. [emphasis added].

*Id.* at 245.

 As in *Vogel,* the contractor in the present case had reassigned the paving certificates to the city, the present holder and owner of such certificates. Like the City of Rockdale in *Vogel,* the city in the present case paid for the construction with other available city funds during the course of construction. We read *Vogel* as authority that the city's use of other funds to make

payments to its contractor for construction work in progress and then to repurchase the certificates and seek to collect the assessments from the property owners is not ultra vires of its corporate powers. Accordingly, we disagree with the property owners' argument under their first four points of error that the city cannot use other available municipal funds to pay for street improvements during the course of construction of those improvements and, thereafter, lawfully levy and collect paving assessments to recover a portion of the cost of those same improvements. To the contrary, we hold that a home rule city which uses general street improvement bond proceeds to pay its street improvement contracts has the right to assess abutting property owners under Article 1105b.

Second, we consider application of the front foot plan or rule. The property owners assert that the city cannot assess a portion of the costs against abutting property owners because of certain tract dimension and present real estate use considerations. The property owners argue that no adjustment was made by the city "for the size, shape or square footage of the lot, or for its present development, whether it be in use for commercial, industrial or retail use, or whether the property was vacant" and that, therefore, the assessments were arbitrary and capricious. In effect, the property owners are contending that the assessments were arbitrary and capricious because of application of the front foot plan or rule as permitted by Article 1105b, Section 7:

> The part of *the cost of improvements* on each portion of highway ordered improved which may be assessed against abutting property and owners thereof *shall be apportioned* among the parcels of abutting property and owners thereof, *in accordance with the Front Foot Plan or Rule provided* that *if* the application of this rule would, in the opinion of the Governing Body, *in particular cases, result in injustice or inequality,* it shall be the *duty* of said Body *to apportion* and *assess* said costs in such proportion *as it may deem just and equitable,* having in

view the special benefits in enhanced value to be received by such parcels of property and owners thereof, the equities of such owners, and the adjustment of such apportionment so as to produce a substantial equality of benefits received and burdens imposed. [Emphasis added].

The property owners, however, do not tell us how application of the front foot plan or rule would result in "injustice or inequality." It is true that at the hearing some of the appellant property owners pointed to tract dimension and present real estate use considerations they perceived as important, but nowhere did they proffer the city council evidence upon which the city council could determine that in their particular cases application of the front foot plan or rule would result in "injustice or inequality." To the extent that *City of Houston v. Alnoa G. Corp.,* 638 S.W.2d 515 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.), may be read to hold that an assessment was arbitrary and capricious solely for the reason that there was property owner expert testimony before the city council "that the appellee's lots were irregular in width, depth and shape, and that the application of the front foot rule would result in disproportionate assessment of costs on a square foot basis," then we decline to follow that holding. To hold an assessment under the front foot plan or rule arbitrary solely on that evidence, without more, would vitiate use of the front foot plan or rule in every circumstance as it would be virtually impossible for the situation to occur where all tracts to be assessed were of identical dimensions. Therefore, we conclude that a mere showing of the existence of a difference in the size, shape or square footage of tracts abutting a street is insufficient to establish that application of the front foot plan or rule would result in "injustice or inequality." Likewise, to hold an assessment under the front foot plan or rule arbitrary solely on evidence of a tract's "present development, whether it be in use for commercial, industrial or retail use, or whether the property was vacant," without more, would also vitiate use of the

front foot plan or rule. The determination of special benefits in *enhanced value* as used in Article 1105b, Section 9, speaks to enhanced value resulting from improvements alone without limitations imposed by present use choices made by an individual owner. For illustration, under the property owners' theory an owner could deliberately cause his property to remain vacant, point to that fact at the hearing before the city council and defeat assessment. A present use, or lack of use, of property cannot negate the fact that street improvements might appreciate the value of the property regardless of the present use, if any. Accordingly, we conclude that a mere showing of the present development of a tract, whether its use be commercial, industrial or retail or whether the property is vacant is insufficient to establish that application of the front foot plan or rule would result in "injustice or inequality". We leave the question of what must be shown to establish "injustice and inequality" to another case and time. It follows, therefore, and we so hold, that in the present case the assessments were not arbitrary and capricious because no adjustment was made because of the tract dimension and present real estate use considerations relied on by the property owners.

Third, we consider the city's alleged intent to use the assessments for improving other streets. The property owners contend that even if a city may spend proceeds from the sale of the bonds and also assess abutting property owners, the city may not do so in the present case because the evidence establishes that the assessments to be collected from them were intended by the city for use in improving other streets in the city, not Belt Line Road. In support of this contention the property owners point to the contents of (1) a memorandum from the city manager to members of the mayor's advisory committee, (2) a memorandum from the city manager to the mayor and members of the city council, (3) a memorandum from the city manager to the city's director of finance and (4) a memorandum from the city manager to the city engineer.

For the purposes of this opinion we assume, but do not decide, that these memoranda express the city manager's intent to use assessment funds to improve other streets, not Belt Line Road. We conclude, however, that these memoranda are not binding on the city in the present case. Article 1105b, Section 9, contains language directed to this very situation, i.e., "no words or acts of any officer or employee of the city, or member of any governing body shown in its written proceedings and records shall in any way affect the force and effect of the provisions of this Act." Moreover, the only way a political subdivision of the state can act, practically as well as legally, is by and through its governing body. *See Kingsville Independent School District v. Cooper,* 611 F.2d 1109, 1112 (5th Cir.1980). Statements by individual members of a council or board are not binding on a governmental body which may act only in its official capacity. *City of Farmers Branch v. Hawnco, Inc.,* 435 S.W.2d 288, 292 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r. e.). *See also Austin Neighborhoods Council v. Board of Adjustment of Austin,* 644 S.W.2d 560, 564 (Tex.App.—Austin 1982, no writ); *Stirman v. City of Tyler,* 443 S.W.2d 354, 358 (Tex.Civ.App.—Tyler 1969, writ ref'd n.r.e.); *Driggs v. City of Denison,* 420 S.W.2d 446, 449 (Tex.Civ.App.—Dallas 1967, no writ). We conclude, therefore, that expressions of intent, if any, contained in the memoranda from the city manager and relied on by the property owners are not binding on the city. Accordingly, we hold that the city manager's memoranda do not affect the city's rights under Article 1105b to assess the property owners in the present case.

### Whether the Amount of the Assessments Was Arbitrary and Capricious

In their fifth and sixth points, the property owners assert that there was no legally sufficient evidence upon which the city council could base assessments against them. The property owners ground this assertion on their contention that there was no evidence before the city council upon which it could determine the amount of

special benefits received by property owners and their properties as provided in Article 1105b. Without such evidence, the property owners argue that the assessments are arbitrary and capricious.

 The amount of an assessment may not be based upon an arbitrary determination. *City of Houston v. Blackbird*, 394 S.W.2d 159 (Tex.1965). Under Article 1105b, Section 9, no authority is given a property owner to contest in court the determination of the amount of special benefits.

> It will be noted also that authority is expressly conferred on owners to contest at the hearing both "the amounts of the proposed assessments" and "the special benefits to the abutting property and owners thereof"; but that on appeal, whereas authority is expressly given to contest assessments "on account of the amount thereof," no authority is expressly given to contest the determination of the amount of special benefits. The failure of the Legislature to provide expressly that abutting property owners should have a right on appeal to contest the amount of special benefits as determined by the governing body of a city is both glaring and significant, particularly since the special benefits thus determined establish a ceiling for assessments. The Legislature must have intended that a finding of special benefits to abutting property and a determination of the amount thereof should be entrusted to the discretion and judgment of the governing body of a city, else these matters would have been made subject to contest on appeal.

*Id.* at 162.

 Thus, on appeal to the courts, dissatisfied property owners are not entitled to a trial de novo of issues relating to benefits accruing from improvements, and acts of a governing body of a city in finding benefits to a property and in determining the amount of the benefits under Article 1105b can be set aside and annulled only because they are arbitrary or are the result of fraud. *Id.* at 160, 163. In the present case there is no suggestion of fraud. We turn then to a consideration of whether the city council acted arbitrarily. That is a question of law, not a question of fact. *Id.* at 163.

The present case involves commercial properties located in one of the fastest growing areas of commercial development in this state. Prior to the improvements, Belt Line was an inadequate four-lane road composed of asphalt, the surface of which was in a bad state of repair. It did have a middle turn lane that was available to the people traveling east or west but, on occasion, both sides tried to use it at the same time. Also, there was a significant drop in the roadway to adjoining properties. In sum, Belt Line Road was not only a safety hazard to the traveling public, but an impediment to the business of the numerous commercial firms along Belt Line as well as an impediment to further commercial development. As a result of the improvements which are being assessed, Belt Line Road is now a six-lane divided thoroughfare with protected left-hand turn lanes at all intersections plus a number of other locations. Further, the road will be properly lighted and there will be storm drainage to carry off water that had, in some places, been destroying the roadway.

 In the present case the property owners were assessed $81.00 per front foot which represented twenty-three percent (23%) of the city's share of the cost of the improvements.[1] The $81.00 per front foot was determined by the city to be the cost of

---

1. Under Article 1105b, Section 6, the city may "assess all the cost of constructing, reconstructing, repairing, and realigning, curbs, gutters, and sidewalks, and not exceeding *nine-tenths* of the estimated cost of such improvements, exclusive of curbs, gutters, and sidewalks...." (Emphasis ours). We do not agree with the city that they could have as-
sessed approximately $140.00 per front foot because of the statutory maximum of ninety percent (90%). We reach this conclusion because the city did not establish special benefits of approximately $140.00 per front foot as would be required under Article 1105b, Section 9.

constructing eighteen and one-half (18½) feet of new paving in a new street or the present cost of constructing one-half of a thirty-seven (37) foot street. The city council heard testimony from Mr. Darryl Snadden, a developer who buys and sells real estate and who has owned property along Belt Line Road since 1973, that all properties along Belt Line Road would be increased in value by at least $81.00 per front foot. Thus the city council heard evidence that each of the property owners' properties would be increased in value by at least $81.00 per front foot. *Cf. Garcia v. City of Alice,* 505 S.W.2d 611 (Tex.Civ.App.—San Antonio 1974, no writ), where the court determined that the implied finding that appellant's property was benefited to the extent of $6.27 a front foot was arbitrary when there was absolutely no evidence that the property would be enhanced in value as a result of the improvements in an amount equal to $6.27 per front foot. Under Article 1105b, Section 9, the city was free to credit Mr. Snadden and make a finding on conflicting evidence. Thus we conclude that there was sufficient evidence before the city council upon which it could determine the amount of special benefits received by the property owners and their properties as provided in Article 1105b. Therefore, we conclude further that the implied finding by the city council that the property owners' property was benefited at least to the extent and in the amount of $81.00 per front foot was not arbitrary. It follows, and we so hold, that the assessments were not arbitrary and capricious.

### Whether the Property Owners Were Afforded a Fair and Impartial Public Hearing on the Assessments

Article 1105b, Section 9, provides that no assessment shall be made against any abutting property· or its owners until after notice and opportunity for hearing. Article 1105b, Section 9, describes that hearing:

Such hearing shall be by and before the governing body of such city and all owning any such abutting property, or any interest therein, and all owning any such railway, street railway or interurban, or any interest therein, shall have the right, at such hearing, to be heard on any matter as to which hearing is a constitutional prerequisite to the validity of any assessment authorized by this Act, and to contest the amounts of the proposed assessments, the lien and liability thereof, the special benefits to the abutting property and owners thereof by means of the improvements for which assessments are to be levied, the accuracy, sufficiency, regularity and validity of the proceedings and contract in connection with such improvements and proposed assessments, . . . .

In their seventh and eighth points, the property owners contend that "[a] reading of the transcripts of the hearings . . . leads a reasonable person to believe that the city was simply 'going through the motions' of a hearing without any intention of making any adjustment or correcting any inequity to any property owner." As evidence of "going through the motions," the property owners point to the failure of the city to employ real estate appraisers, or other qualified persons, to examine each separate tract to determine the amount of special benefits, if any, to such tracts, citing *City of Tyler v. Wynne,* 434 S.W.2d 938 (Tex.Civ. App.—Tyler 1968, writ ref'd n.r.e.). That case, however, does not, as the property owners contend, require a city to employ appraisers. In *City of Tyler* the court only commented that the city, in an effort to be fair, had employed two appraisers. In *City of Tyler* the validity of the special benefit determination was upheld because there was evidence before the city council (like the testimony of Mr. Snadden) that "the property would be enhanced in value at least to the amount of the assessment." *Id.* at 940. As further evidence of "going through the motions," the property owners point to several remarks or rulings by the mayor and several of the councilmen. We have studied the remarks and rulings complained of and conclude that they fail to establish that the city council was simply "going through the motions" of conducting the required public hearing. Moreover, the property owners fail to tell us how any of

these remarks or rulings in any way prevented them from being heard on any matter permitted by Article 1105b or from contesting any matter permitted by Article 1105b, and from our reading of the remarks and rulings complained of, we are unable to find how any remark or ruling did so. We conclude, therefore, that the property owners were afforded a fair and impartial public hearing on their assessments.

### The Error in the Calculation of Albert's Assessment

Albert was assessed for 190.84 front feet. The stipulated plat shows Albert's property to front 180.84 feet on Belt Line Road. The city, however, "squared off" a "corner clip" on the southwest corner of Albert's property resulting in an additional ten (10) feet of frontage. In his ninth point, Albert contends that his assessment was incorrectly calculated as a matter of law because he was assessed for a portion of the "corner clip" and that, therefore, the assessment is mathematically incorrect by ten (10) feet in the amount of $810.00. The city contends that it was entitled to "square off" and assess for a portion of the "corner clip". In view of our disposition of this point, we do not reach the merits of the city's argument on this issue.

In his brief Albert tells us that he "was not in attendance at the hearings, [the Article 1105b, Section 9, public hearings before the city council on the assessments] and [that] the error in his frontage was not brought to the attention of the Council." Thus in addressing Albert's contention, we must first determine whether Albert is entitled to relief on appeal to the district court from the assessment made by the city council when he did not raise the incorrect calculation before the city council. We conclude that in the present case Albert is not entitled to the relief sought on appeal to the district court. Article 1105b, Section 9, provides in pertinent part:

> Anyone owning or claiming any property assessed, or any interest therein, or any railway, street railway, or interurban assessed, or any interest therein, who shall desire to contest any such assessment on account of the amount thereof, or any inaccuracy, irregularity, invalidity, or insufficiency of the proceedings or contract with reference thereto, or with reference to such improvements, or on account of any matter or thing not in the discretion of the governing body, shall have the right to appeal therefrom and from such hearing by instituting suit for that purpose in any court having jurisdiction, within fifteen (15) days from the time such assessment is levied, and anyone who shall fail to institute such suit within such time shall be held to have waived *every matter which might have been taken advantage of at such hearing,* and shall be barred and estopped from in any manner contesting or questioning such assessment, the amount, accuracy, validity, regularity, and sufficiency thereof, and of the proceedings and contract with reference thereto and with reference to such improvement for or on account of any matter whatsoever. And the only defense to any such assessment in any suit to enforce the same shall be that the notice of hearing was not mailed as required or was not published or did not contain the substance of one or more of the requisites therefor herein prescribed, or that the assessments exceed the amount of the estimate, and no words or acts of any officer or employee of the city, or member of any governing body shown in its written proceedings and records shall in any way affect the force and effect of the provisions of this Act. (Emphasis ours)

We interpret the phrase "every matter which might have been taken advantage of at such hearing" in language providing for waiver by failing to institute suit within fifteen (15) days from the time assessment is levied to mean that if a matter is one that could have been raised before the city council at the hearing provided by Article 1105b, Section 9, then the matter cannot be raised for the first time on appeal to the district court and that failure to so raise the matter constitutes a waiver of the matter.

Were we to hold that under Article 1105b, Section 9, a property owner could raise any matter for the first time on appeal to the court having jurisdiction, then carried to its logical conclusion such a holding would permit a dissatisfied property owner to ignore the hearing before the city council and on appeal within fifteen (15) days from the time assessment is levied to the court having jurisdiction there raise for the first time any and all matters pertaining to this assessment. We do not believe that the legislature intended any such result. It is appropriate that the city council be given the first opportunity to correct alleged mistakes or errors in calculating the amount of an assessment. Indeed, in the present case appellant Cook asserted at the hearing before the city council that he should not be assessed for a "corner clip" on his property and at that hearing the assessment for a portion of the "corner clip" was deleted and a correction made in Cook's assessment. We conclude that the alleged incorrect calculation is a matter which Albert could have raised before the city council at the hearing provided for by Article 1105b, Section 9. Accordingly, we hold that because Albert did not raise the alleged incorrect calculation of his assessment before the city council at the Article 1105b, Section 9, public hearings he waived his right to contest in the district court the alleged incorrectly calculated assessment resulting from the "squaring off" of a "corner clip" on his property.[2]

Affirmed.

---

**2.** Therefore, had we sustained any of the first eight points of error and reversed, we would still affirm as to Albert because he failed to appear before the city council and take advantage of the opportunity to be heard as afforded by Article 1105b, Section 9.