TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00226-CV






PODER, Govalle/Johnston Terrace Neighborhood Planning Team,

Old West Austin Neighborhood Association and Fix Austin, Appellants


v.


City of Austin; Mayor of Austin, The Honorable Will Wynn;

Mayor Pro Tem Betty Dunkerley; Council Member Mike Martinez;

Council Member Jennifer Kim; Council Member Lee Leffingwell;

Council Member Brewster McCracken; Council Member Sheryl Cole; et al., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. D-1-GN-07-003351, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 

 In this suit, appellants PODER (People Organized in the Defense of the Earth and her
Resources), Govalle/Johnston Terrace Neighborhood Planning Team, Old West Austin
Neighborhood Association, and Fix Austin challenge the relocation of the City of Austin's animal
shelter from Central Austin to the Health and Human Services Department campus ("HHSD
campus") in East Austin. Appellants appeal from a summary judgment in favor of appellees the
City of Austin; Mayor of Austin, the Honorable Will Wynn; Mayor Pro Tem Betty Dunkerley;
Council Member Mike Martinez; Council Member Jennifer Kim; Council Member Lee Leffingwell;
Council Member Brewster McCracken; Council Member Sheryl Cole; and City Manager
Toby Futrell that upheld the City's decision to proceed with relocating its animal shelter to the
HHSD campus. (1)

 In three issues, appellants contend the trial court erred in granting summary judgment
because (i) the City violated Article X of the Austin City Charter (2) in that the animal shelter
relocation was required to be included in the City's comprehensive plan and it was not; (ii) the
city council violated the Texas Open Meetings Act ("TOMA") (3) by taking action on the animal
shelter relocation without including that action in its meeting notice and minutes; and (iii) members
of the city council, the mayor, and the city manager do not have legislative immunity. Because we
conclude the trial court did not err in granting summary judgment in the City's favor, we affirm the
trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 

 The HHSD campus is located in the Johnston Terrace neighborhood in East Austin. 
The Austin Tomorrow Comprehensive Plan ("Comprehensive Plan"), the neighborhood plan for
the Johnston Terrace neighborhood, and city zoning ordinances address the HHSD campus's
future development and uses. The Comprehensive Plan, adopted in the late 1970s, is the City's
comprehensive plan for future development and growth. See generally Comprehensive Plan (1979). (4) 
Its policies are implemented in the City's land development code. Austin, Tex., Land Dev. Code
§ 25-1-1 (2008) ("This title implements the planning policies of the Comprehensive Plan and shall
be construed to achieve its purposes."). The Comprehensive Plan includes neighborhood plans
adopted by the city council, and, in March 2003, the city council adopted the Govalle/Johnston
Terrace Combined Neighborhood Plan ("Neighborhood Plan") as an element of the Comprehensive
Plan. Austin, Tex., Ordinance No. 030327-12 (Mar. 27, 2003). The Neighborhood Plan includes
a narrative that has an "Adopted Future Land Use Map" listing "civic use" for the HHSD campus
and specific suggestions for the HHSD campus's future development and use: 


 This property is now owned by the City of Austin through the Health and HumanServices Department. A large portion of the northern part of this site is affected by
a power line that runs through the property. This power line constitutes a significant

 impediment to development of this part of the property.

 

 Neighborhood stakeholders suggested that if it was possible to re-route these power
lines that this site might be appropriate for residential development. Residential
development that was affordable and available to local families is supported by this
plan.

 

 If it is not possible to re-route the power line, other suggestions for this property were

 recreational uses including:

 

  Playing fields--since the cessation of the soccer on the "informal" field at
Oak Springs, there is a lack of places for soccer in this area. A baseball
diamond was also mentioned as another form of playing field that would be
appropriate;

  Small walking trail;

  Playground.


 At the same time, the city council adopted the Neighborhood Plan, it adopted
ordinances re-zoning and changing the zoning map for the Govalle and Johnston Terrace
neighborhoods. In the ordinance for the Johnston Terrace neighborhood, the HHSD campus is zoned
"P-NP." Austin, Tex., Ordinance No. 030327-11b (Mar. 27, 2003). The "P" designates public use,
and the "NP" designates zoning in conjunction with a neighborhood plan. Austin, Tex., Land
Dev. Code § 25-2-32 (E)(5) ("P"), (F)(19) ("NP") (2008).

 In November 2006, Austin voters approved a bond package that included, in
Proposition 7, authorization for the City to issue and sell general obligation bonds and notes "for
the public purposes of constructing, renovating, improving, and equipping public safety facilities,
including, without limitation, . . . an animal shelter, and other related facilities and acquiring land
and interests in land and property necessary to do so." See Austin, Tex., Ordinance No. 20060608-084, Part 1 (June 8, 2006) (city council established bond proposition language). The City's animal
shelter has been at the same location in Central Austin from the mid-1950s and "is difficult to
maintain because the infrastructure has deteriorated, there have been problems with flooding, the
building has an obsolete design, and lacks state of the art technology." "Bond brochure language"
for Proposition 7 included the HHSD campus as a proposed location for a new animal shelter.

 The agenda for the city council meeting on March 8, 2007, included two items related
to the bond package and Proposition 7. Item 2 was a recommendation for a resolution to declare the
City's intent to reimburse itself from the November 2006 bonds. Item 3 was a recommendation to
amend the City's budget ordinance for the fiscal year 2006-2007 to include the funds from the bond
election. At the March 8, 2007, meeting, the city council approved both items--a resolution to
reimburse the City from the bond package and an ordinance amending the budget to include the
funds from the bond election. The ordinance amended the "Fiscal Year 2006-2007 Health and
Human Services Capital Budget . . . to increase appropriations for November 2006 Proposition 7
project expenditures by an amount of $850,000 related to an animal shelter facility." Austin, Tex.,
Ordinance No. 20070308-003, Part 6 (Mar. 8, 2007).

 Appellants filed suit against the City on October 1, 2007, seeking declaratory and
mandamus relief, contending that the City had violated the TOMA at the March 8, 2007, city council
meeting by failing to post notice of its purported actions at the meeting to amend the Neighborhood
Plan and "to authorize city funds to be used to move the shelter from its current location." 
Appellants also sought declarations that any "purported vote" by the city council to amend the
Neighborhood Plan was void, and that the City may not amend the Neighborhood Plan without
complying with the neighborhood planning procedures and posting notice of the city council's
consideration of such amendment.

 The city council addressed the animal shelter's relocation to the HHSD
campus at a city council meeting on October 11, 2007. The agenda for this meeting included
Item 62--"[a]pprove a resolution designating the location for the new animal center and directing
the City Manager to proceed with planning for the facility." (5) At the meeting, city staff presented
"problems" with the animal shelter's current location and the proposal for the location of a new
animal shelter at 7201 Levander Loop "known as the Health and Human Services Campus." The
public also offered comment. The city council voted to approve a resolution that "the City Council
directs the City Manager to proceed with the planning of the new animal center at 7201 Levander
Loop, Austin, TX." Austin, Tex., Resolution No. 20071011-062 (Oct. 11, 2007). (6) A week later at
its October 18, 2007, meeting, the city council authorized the "negotiation and execution of a
professional services agreement . . . for architectural services for the new animal center."

 In January 2008, appellants amended their petition to add the mayor, mayor pro tem,
city council members, and the city manager as defendants in their individual capacities and
additionally sought to have the city council's actions at its October 11 and October 18 meetings
concerning the animal shelter relocation declared void. Appellants also filed a motion for summary
judgment against the City seeking a declaration that the city council's actions to relocate the animal
shelter to the HHSD campus were unlawful and violated the city charter and planning ordinances
because the proposed animal shelter is omitted from the Comprehensive Plan as amended by
the Neighborhood Plan, is inconsistent with the Neighborhood Plan, and falls within the definition
of a "kennel" as a commercial, not civic, use. Appellants' summary judgment evidence included
the city council's minutes from its meetings on March 27, 2003, October 11, 2007, and October 18,
2007, and the affidavit of Daniel Llanes, one of the original participants of the Govalle/Johnston
Terrace neighborhood planning team. Llanes averred that the Health and Human Services
Department informally asked the planning team in 2007 about relocating the animal shelter to
the HHSD campus and that the planning team responded that the animal shelter should remain in
West Austin and that it "wanted to see housing on [the HHSD campus] as included in the
[N]eighborhood [P]lan." Llanes also averred that no amendment to the Neighborhood Plan for the
relocation was proposed.

 In March 2008, the City filed a competing motion for summary judgment on
the ground that the city council's actions to relocate the animal shelter had not violated the city
charter, the Comprehensive Plan, or the Neighborhood Plan. The City also sought summary
judgment on the grounds that the city council had not violated the TOMA by its notice or actions
taken at its meeting on March 8, 2007, that the individual defendants had legislative immunity, and
that appellants had not alleged a cause of action against the city manager. The City's summary
judgment evidence included the city council agendas for the March 8, 2007, October 11, 2007,
and October 18, 2007, meetings; the minutes from the March 8, 2007, and October 11, 2007,
meetings; and the affidavits of Greg Guernsey, the director of neighborhood planning and zoning,
and David Lurie, the director of the Health and Human Services Department. Guernsey averred that
a "neighborhood plan serves as a way to advise the City about the concerns of the neighborhood and
to provide a means to handle those concerns" and the "Future Land Use Map is the proposed land
use for the property. It is used as a guide in making zoning decisions." Lurie averred to the current
animal shelter's condition, the HHSD campus, and the city council meeting on October 11, 2007.

 Both sides filed responses to the opposing parties' motions for summary judgment.
Appellants' responses included additional evidence on their claim that the city council violated
the TOMA--a request for statements of qualifications ("RFQ") by the city manager in May 2007
and e-mails. The RFQ was for the Health and Human Services Department for professional services
for the animal shelter project--"replace existing facility and develop related infrastructure to
support new Animal Shelter at the Health and Human Services Campus at 7201 Levander Loop." 
The e-mails included (i) an e-mail to Dunkerley reporting on an animal advisory commission
meeting that occurred in January 2007; (ii) a series of e-mails exchanged between the city manager
and representatives from Fix Austin and the Old West Austin Neighborhood Association after the
March 8, 2007, city council meeting; (7) and (iii) a series of e-mails between a Fix Austin
representative and Dunkerley from October 2006 to January 2007 concerning the relocation of the
animal shelter and when the city council would make a final decision. 

 After a hearing, the trial court granted summary judgment for the City "on all grounds
asserted except the ground that the Plaintiffs have not alleged a cause of action against the City
Manager." This appeal followed.


ANALYSIS


 In three issues, appellants challenge the trial court's grant of summary judgment in
favor of the City. In their first issue, appellants contend that the trial court erred in granting summary
judgment because the "Planning Article of the Austin City Charter prohibit(s) expenditures for a
capital improvement project--in this case a multi-million dollar animal shelter--that is not even
mentioned in the City's master plan or in the affected neighborhood plan." In their second issue,
appellants contend that they produced competent summary judgment evidence that the city council
violated the TOMA at its March 8, 2007, meeting, precluding summary judgment in favor of
the City on appellants' TOMA declaratory claim. In their third issue, appellants contend that
"the members of the Austin City Council [do not] have legislative immunity from a suit for
declaratory judgment that the Council members acted in excess of their authority under the
Austin City Charter by authorizing expenditures for a capital improvement project that is not
included in the City's Comprehensive Plan."


Standard of Review


 We review the trial court's decision to grant summary judgment de novo. Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a summary judgment
motion, the movant must demonstrate that there are no genuine issues of material fact and that it is
entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); American Tobacco Co. v. Grinnell,
951 S.W.2d 420, 425 (Tex. 1997). In deciding whether there is a disputed material fact issue
precluding summary judgment, we must take evidence favorable to the nonmovant as true, indulge
every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's
favor. Dorsett, 164 S.W.3d at 661; Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49
(Tex. 1985). A defendant may establish its entitlement to summary judgment by disproving at least
one element of each of the plaintiff's claims. American Tobacco Co., 951 S.W.2d at 425. If the
movant shows that it is entitled to judgment as a matter of law, the burden shifts to the nonmovant
to present evidence to raise a material fact issue that precludes summary judgment. See City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).

 When the material facts are not in dispute, both parties move for summary judgment,
and the district court grants one motion and denies the other, we review the summary judgment
evidence presented by both sides, determine all questions presented, and render the judgment the
trial court should have rendered. Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.,
136 S.W.3d 643, 648 (Tex. 2004). Where the trial court does not specify the grounds for its
summary judgment, we must affirm the summary judgment if any of the theories presented to
the trial court and preserved for appellate review is meritorious. Provident Life & Accident Ins. Co.
v. Knott, 128 S.W.3d 211, 216 (Tex. 2003).

 Statutory interpretation is a question of law and is properly resolved by
summary judgment. City of Plugerville v. Capital Metro. Transp. Auth., 123 S.W.3d 106, 109
(Tex. App.--Austin 2003, pet. denied). We review matters of statutory construction de novo, and
our primary goal is to determine and give effect to the legislature's intent. City of San Antonio
v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003). We begin with the plain language of the statute
at issue and apply its common meaning. Id. Where the statutory text is unambiguous, we adopt a
construction supported by the statute's plain language, unless that construction would lead to
an absurd result. Fleming Foods of Tex., Inc. v. Rylander, 6 S.W.3d 278, 284 (Tex. 1999). In
construing city charters and municipal ordinances, we use the same rules as we do when construing
statutes. Board of Adjustment of San Antonio v. Wende, 92 S.W.3d 424, 430 (Tex. 2002); Hammond
v. City of Dallas, 712 S.W.2d 496, 498 (Tex. 1986); City of Austin v. Hyde Park Baptist Church,
152 S.W.3d 162, 165-66 (Tex. App.--Austin 2004, no pet.).


The City Charter, Comprehensive Plan, and Neighborhood Plan


 In their first issue, appellants contend that the City violated Article X of the
city charter because the "capital improvement project for relocating the animal shelter was required
to be included in the City's comprehensive [plan] and it was not included, therefore, the City lacked
authority to proceed with the relocation project." Appellants rely on the facts that "the animal shelter
program and the capital improvement, public facilities project for relocating the animal shelter are
not mentioned anywhere in the City's Comprehensive Plan," the Neighborhood Plan "contained
specific use expectations for use of [the HHSD campus] which do not include and are inconsistent
with use as an animal shelter," and the city council has not held a hearing to amend the
Comprehensive Plan or the Neighborhood Plan.

 The Comprehensive Plan, per the city charter, requires amendment when physical
development conflicts with the plan:

 

 The Charter states further that no physical development in the city can be undertaken
or authorized which it is in conflict with the master plan unless the plan is duly
amended as recommended by the Planning Commission and approved by the City
Council.


Comprehensive Plan, Chapter 1, Page 3. The City also has a procedure for amending a
neighborhood plan. Austin, Tex., Ordinance No. 030605-53, Part 4 (June 5, 2003) (amendment to
procedure to amend a neighborhood plan); Ordinance No. 030320-23 (Mar. 20, 2003) (procedure
to amend a neighborhood plan). Reasons for amending a neighborhood plan include "because of a
mapping or textual error or omission made when the original plan was adopted or during subsequent
amendments." Austin, Tex., Ordinance No. 030320-23, Part 8. The City has not sought to amend
the Comprehensive Plan or the Neighborhood Plan, as part of its efforts to relocate its animal shelter;
the issue then is whether the animal shelter's relocation conforms and is consistent with the
Comprehensive Plan and Neighborhood Plan so that amendment was not required.

 Appellants rely on sections one, five, and six of Article X of the city charter to
support their position that the project to relocate the animal shelter must be specifically included in
the plans and that an amendment was required. Section one of Article X states the purpose and
intent of comprehensive planning:


 It is the purpose and intent of this article that the city council establish
comprehensive planning as a continuous and ongoing governmental function in order
to promote and strengthen the existing role, processes and powers of the City of
Austin to prepare, adopt and implement a comprehensive plan to guide, regulate and
manage the future development within the corporate limits and extraterritorial
jurisdiction of the city. . . .


 It is further the intent of this article that the adopted comprehensive plan shall have
the legal status set forth herein, and that no public or private development shall be
permitted, except in conformity with such adopted comprehensive plan or element
or portion thereof, prepared and adopted in conformity with the provisions of this
article.


 Austin City Charter, art. X, § 1 (2008); see also Tex. Loc. Gov't Code Ann. § 213.002 (West 2008)

(municipality may adopt comprehensive plan "for long-range development" and to "be used to
coordinate and guide the establishment of development regulations").

 Section five outlines the comprehensive plan's required elements:

 

 The Council shall adopt by ordinance a comprehensive plan, which shall constitute
the master and general plan. The comprehensive plan shall contain the council's
policies for growth, development and beautification of the land within the corporate
limits and the extrajudicial jurisdiction of the city, or for geographical portions
thereof including neighborhood, community or areawide plans. The comprehensive
plan shall include the following elements: (1) a future land use element; (2) a traffic
circulation and mass transit element; (3) a wastewater, solid waste, drainage
and potable water element; (4) a conservation and environmental resources element;
(5) a recreation and open space element; (6) a housing element; (7) a public services
and facilities element, which shall include but not be limited to a capital
improvement program; (8) a public buildings and related facilities element; (9) an
economic element for commercial and industrial development and redevelopment;
and (10) health and human service element.


 The council may also adopt by ordinance other elements as are necessary or desirable
to establish and implement policies for growth, development and beautification
within the city, its extraterritorial jurisdiction, or for geographic portions thereof,
including neighborhood, community, or areawide plans. . . .


 The several elements of the comprehensive plan shall be coordinated and be
internally consistent. Each element shall include policy recommendations for its
implementation and shall be implemented, in part, by the adoption and enforcement
of appropriate land development regulations.



Austin City Charter, art. X, § 5 (2008).


 Section six addresses the "legal effect" of an adopted comprehensive plan:


 

 Upon adoption of a comprehensive plan or element or portion thereof by the city
council, all land development regulations including zoning and map, subdivision
regulations, roadway plan, all public improvements, public facilities, public utilities
projects and all city regulatory actions relating to land use, subdivision and
development approval shall be consistent with the comprehensive plan, element or
portion thereof as adopted. For purposes of clarity, consistency and facilitation of
comprehensive planning and land development process, the various types of local
regulations or laws concerning the development of land may be combined in their
totality in a single ordinance known as the Land Development Code of the City of
Austin.


Id. § 6 (2008).

 Appellants rely on the language from these sections in Article X that a comprehensive
plan "regulate[s] and manage[s] the future development," must be "internally consistent" and
include "public improvements," "public facilities," and "a capital improvement program," and "all
public improvements, public facilities . . . shall be consistent with the comprehensive plan"
to contend that the City's project to relocate the animal shelter is required to be specifically
included in the Comprehensive Plan as amended by the Neighborhood Plan. The city charter's plain
language, however, does not express an intent for the Comprehensive Plan to list specific public
facilities projects, but for the plan to include general policies for such projects and that the projects
conform and be consistent with the plan. See City of San Antonio, 111 S.W.3d at 25.

 The Comprehensive Plan as amended by the Neighborhood Plan follows the
city charter's guidelines. It states that it is a "general statement of policies" for future growth
and development:


 [The plan] is the planning tool which indicates how citizens and their government
leaders want the community to develop. . . . By definition, such a plan must be
comprehensive, general and long range. . . .  [I]t should be a general statement of
policies and proposals but should not specify operational details. . . . [T]he plan
should look beyond the pressing day-to-day decisions to the community's greater
long range goals.



Comprehensive Plan, Chapter 1, Page 3. The Comprehensive Plan also generally provides policies,
objectives, and goals as to the enumerated elements in section five of the city charter, including as
to capital improvements. See generally Comprehensive Plan; see id., Chapter 4, Pages 158-59. (8) 

 The Neighborhood Plan similarly states its purpose is "to guide future development."
Austin, Tex., Ordinance No. 030327-12, Exh. A, at 3. The Neighborhood Plan also states that
"every action item listed in this plan will require separate and specific implementation," that
"[a]pproval of the plan does not legally obligate the City to implement any particular action item,"
that it is a "guidance" document for City staff when reviewing projects and programs, and that
it expresses "the direction the neighborhood desires to go." Id. at 80. We conclude that the
Comprehensive Plan as amended by the Neighborhood Plan, consistent with the city charter's
guidelines and directives, does not require the City's project to relocate its animal shelter to be
expressly included within the plan. We turn then to the city charter's requirement that the project
be consistent and conform with the Comprehensive Plan. Austin City Charter, art. X, §§ 1, 6.

 Appellants contend that the animal shelter's relocation is inconsistent with the
Comprehensive Plan because the use of the HHSD campus as an animal shelter is not included in
the proposed uses of the HHSD campus in the Neighborhood Plan's text. Appellants rely on the
amendment procedure to correct a "textual error or omission" in a neighborhood plan, see Austin,
Tex., Ordinance No. 030320-23, Part 8, and on the specific proposed uses--residential or
recreational--of the HHSD campus in the Neighborhood Plan. Austin, Tex., Ordinance No. 030327-12, Exh. A, at 47. The proposed uses, however, were expressly stated as "suggestions" from the
"neighborhood stakeholders." Id. The Neighborhood Plan "recognizes" that the HHSD campus is
among the properties in the neighborhood where "there is some room for future development and
reuse of properties that are currently vacant or under-utilized." Id. at 44. The Neighborhood Plan
then lists "suggestions" for future uses of the HHSD campus. Id. at 47. The City's ultimate decision
on how it will develop its property does not negate the neighborhood's expectations and
"suggestions." In other words, requiring an amendment to the plan to revise the neighborhood's
suggestions would be akin to requiring the neighborhood's consent. The neighborhood's expressed
"suggestions" do not support an intent to bind the City's development and use of the HHSD campus
to those suggested uses. See City of San Antonio, 111 S.W.3d at 25. We conclude that the animal
shelter's omission from the neighborhood's suggested uses in the plan's text is not a "textual error"
that would require amendment.

 Appellants also contend that the animal shelter's relocation is inconsistent with the
Comprehensive Plan as amended by the Neighborhood Plan because it is a commercial, not civic
use, and that, therefore, the City was required to amend the plan. Appellants argue that an animal
shelter falls within the commercial use classification "kennels." See Austin, Tex., Land Dev. Code
§ 25-2-4(B)(38) (2008). "Kennels use is the use of a site for boarding and care of dogs, cats, or
similar small animals. This use includes boarding kennels, pet motels, and dog training centers." 
Id. Even if we were to conclude that an animal shelter is a type of "kennel," commercial uses do
not include "those classified as . . . civic uses." Id. § 25-2-4(A) (2008). "Civic uses include
. . . governmental functions, and other uses that are strongly vested with public or social
importance." Id. § 25-2-6(A) (2008). Animal control, including a city's animal shelter, is a
governmental function. See Austin, Tex., City Code, Art. 3 (2008); cf., Tex. Civ. Prac. & Rem. Code
Ann. § 101.0215(a)(33) (West 2005) (municipality liable under tort claims act for damages arising
from its governmental functions, including animal control). The animal shelter, as a governmental
function, falls within the civic use classification in the Neighborhood Plan.

 The "Adopted Future Land Use Map" in the Neighborhood Plan lists "civic" use
for the HHSD campus, see Austin, Tex., Ordinance No. 030327-12, Exh. A, at 37, and the HHSD
campus's zoning is "P-NP"--for public use. Austin, Tex., Ordinance No. 030327-11b. The zoning
ordinance adopted in conjunction with the Neighborhood Plan states, "Except as specifically
restricted under this ordinance, the Property may be developed and used in accordance with the
regulations established for the respective base districts and other applicable requirements of the
City Code." Id., Part 5; see also Tex. Loc. Gov't Code Ann. §§ 211.004 (zoning regulations must be
adopted in accordance with comprehensive plan), 213.005 (map of comprehensive plan does
not constitute zoning regulations) (West 2008). The plain language of the Neighborhood Plan
and the zoning ordinance allow civic uses, such as the animal shelter, on the HHSD campus. See
City of San Antonio, 111 S.W.3d at 25.

 We conclude that the City did not violate the city charter by proceeding with its
project to relocate the animal shelter at the HHSD campus without amending the Comprehensive
Plan or the Neighborhood Plan. (9)
 We overrule appellants' first issue.

Texas Open Meetings Act 


 In their second issue, appellants contend that they produced competent summary
judgment evidence that the city council violated the TOMA "for the secret decision on March 8,
2007, to authorize relocating the [animal] shelter." They rely on evidence that relocating the animal
shelter was controversial, sparking "numerous protests, press conferences and editorials" and the
notice and minutes for the March 8, 2007, meeting that the city council would consider and did
consider budget allocations for the animal shelter--"Neither the posted meeting notice nor
the meeting minutes of the Council's March 8, 2007, meeting disclosed that the Council was
deciding to relocate the animal shelter to the East Austin site." Particularly because the decision was
controversial, they contend that the notice was inadequate to permit the city council to decide to
relocate the animal shelter at that meeting. Appellants also rely on e-mails from the city manager
after the meeting and the city manager's action in "proceeding to develop and advertise an RFQ in
May 2007 for architectural services for the animal shelter" at the HHSD campus, contending that
this evidence shows "what the city manager understood" of the city council's "secret decision" to
relocate the animal shelter and "that she had confirmed that understanding with members of the
City Council." In particular, appellants rely on the city manager's statement in her e-mail dated
March 20, 2007, that "[a]s the HHSD staff have communicated in multiple ways, the City Council
has already voted on the new location for the TLAC," and her statement in an e-mail dated
March 27, 2007, that she confirmed her understanding with city council members. (10)

 Section 551.041 of the TOMA states, "A governmental body shall give written notice
of the date, hour, place, and subject of each meeting held by the governmental body." Tex. Gov't
Code Ann. § 551.041 (West 2004). The written notice must provide full and adequate notice of the
subject matter of the governmental meeting:


 Our citizens are entitled to more than a result. They are entitled not only to know
what government decides but to observe how and why every decision is reached. The
explicit command of the statute is for openness at every stage of the deliberations.



Acker v. Tex. Water Comm'n, 790 S.W.2d 299, 300 (Tex. 1990); see City of Farmers Branch
v. Ramos, 235 S.W.3d 462, 466-67 (Tex. App.--Dallas 2007, no pet.) (TOMA requires notice to be
"sufficiently specific to alert the general public to the topics to be considered at the upcoming
meeting"); Mayes v. City of De Leon, 922 S.W.2d 200, 203 (Tex. App.--Eastland 1996, writ denied)
("The notice must provide full and adequate notice of the subject matter, particularly where the
subject is of special interest to the public.").

 Appellants do not dispute that the city council's budgeted actions as to the animal
shelter as reflected in the minutes from the March 8, 2007, meeting were properly noticed. Under
the heading "Budget," Item 2 in the agenda for the meeting states:

 

 Approve a resolution declaring the City of Austin's official intent . . . to reimburse
itself from the November 2006 Proposition 7 General Obligation Bonds to be issued
for expenditures in the amount of $21,850,000 related to public safety facility
projects.



Under the same heading, Item 3 of the agenda states:


 Approve an ordinance . . . amending the Fiscal Year 2006-2007 Health and Human
Services Department Capital Budget . . . to increase appropriations by $850,000 for
a[n] Animal Shelter facility. 



The meeting minutes reflect that items 2 and 3 "were pulled for discussion" and that the city council
voted to approve both items after discussion. The minutes do not reflect and the City does not
contend that the city council voted to relocate the animal shelter at that meeting. The City contends
that the vote to relocate the animal shelter occurred at the October 11, 2007, meeting. Appellants
do not raise a TOMA violation as to the October 11, 2007, meeting. Based on this undisputed
evidence, we conclude the City met its burden to disprove that the city council violated the TOMA
at its March 8, 2007, meeting in its budgeting actions concerning the animal shelter. See American
Tobacco Co., 951 S.W.2d at 425.

 The issue then is whether appellants raised a fact issue to preclude summary
judgment. See City of Houston, 589 S.W.2d at 678. Appellants contend that the city manager's e-mails and subsequent action to proceed with the RFQ are "some admissible evidence that the
City Council did more than take the budget action reflected in their meeting notice and minutes." 
Appellants contend that the city manager's actions and e-mails show that the city council, facing 
controversy on the issue, took the additional "secret" action to decide to relocate the animal shelter
without including the proposed action in the notice for the meeting or its decision in the minutes. (11) 

 Taken in context, the city manager's statement in her March 20, 2007, e-mail that the
city council had already voted on the new location, however, does not support appellants' argument. 
In context, her statement recaps her understanding from a two-year history with public input on the
bond approval for a new animal shelter. The city manager recites the two-year history of the process
to relocate the animal shelter, including public hearings of the bond proposal and the inclusion of
the HHSD campus as the proposed location in the bond public information:


 As the HHSD staff have communicated in multiple ways, the City Council has
already voted on the new location for the TLAC. Here is the quick history . . . 


 The staff put the new TLAC facility on the original needs assessment list at $23
million for rebuilding at the current site. Additional funds were in this number for
a massive drainage retrofit and the costs of relocating animals during construction.

 

 The citizen bond advisory committee (CBAC) reviewed the site proposal, reviewed
a consultant report including an assessment of the HHSD campus site, and cut the
proposed funds back twice to the final recommended amount of $12 million. The
CBAC met for over a year with multiple public hearings and monthly worksessions. 
The $12 million final recommendation to council was predicated on the site being
owned by the City with infrastructure in place and ultimately with the specific
recommendation to place it at the HHSD site.

 

 The site was communicated publicly to Council during the city council bond
presentations and public hearings that preceded the council vote on the bond package.
Copies of power point presentations are available that show the specific location of
the TLAC.

 

 The Council accepted the recommendation as part of the bond package, voted on the
bond package and subsequently on the ballot language.

 

 Subsequent public information and bond brochure language included specific
reference to the selected site for the TLAC during the bond campaign.

 

 After the successful bond election, a new citizen bond oversight committee (CBOC)
was formed by Council and they reviewed the first year spending plan for the bonds,
which included the 1st year design dollars for the TLAC. Their review included
another identification/discussion of the proposed site, as this is needed to move
forward with design. The CBOC recommended the first year spending plan to
Council and Council approved those dollars and plans.

 

 So, I guess the bottom line is that this discussion has been going on for over 2 years. 
Unless there is council direction to change course, we have a council direction to
move ahead with implementation of the approved bond package, which includes the
design of the TLAC at the HHSD site.



 Appellants also place significance on the city manager's statement in her e-mail on
March 27, 2007, that she had "followed up again with Council Members over the last week." That
this statement addresses her perception of the city council's "direction of this project" from the
bond package approval is clear from its context:


 I know you may think we are fighting on this, but I am simply trying to be straight
with you. The biggest disservice I could do to you would be to allow the project
to keep moving ahead and not clearly present where we are, what we are doing
and why. So, I am not going to repeat all the information from the 2 prior e-mail
responses tonight where all the same people have been copied, instead just a few
recaps:


 1. The legal opinion simply says that the Council is not bound by the brochure
language. It does not say that Council did not made [sic] a decision, only that
Council can change that decision because it is not locked in by the bond brochure
language. Had the site been specified in the ballot language, Council would be
locked in. That is a clarifier that we sought and shared with Council and others, so
that everyone knew what their options were.


 2. Council as our policy making body can and does listen to all citizens and
advocates, reserves the right to rethink a decision and has the ability to change the
direction of this project with a vote of the council body. But they have not done that. 
And I have followed up again with Council Members over the last week.


 3. The Citizens Bond Advisory Committee, after almost 2 years of a public process
to create the 2006 bond package and through a specific recommendation by
the Facilities Subcommittee, made a site-specific recommendation on the Animal
Shelter. . . . Those recommendations were made by the CBAC and approved by
Council, . . . All our subsequent bond election public information reflected those
decisions.


 4. Despite all the projects competing for funding, the recent approval of funds for
staff to move forward on the design and engineering of the Shelter, which has to be 
site specific, in the few months remaining in the year one spending plan should
clearly signal Council direction. If we still had no site, it would not have made sense
to allocate precious funds to a project that could not get started without a site when
other projects are ready to go. . . . 



(emphasis added).


 In this same e-mail, the city manager's reference and apparent reliance on the
"recent approval of funds for staff to move forward on the design and engineering of the
Shelter"--proceeding with the RFQ--also does not support appellants' contention that the
city council violated the TOMA at its March 8, 2007, meeting. The "approval of funds" was
undisputably included in the notice and minutes from the March 8, 2007, meeting--the allocation of
funds from the bond package and the increase in appropriations in the HHSD's budget for the animal
shelter. Appellants do not dispute that the city manager, whose duties are to administer the City's
day-to-day affairs, acted within her authority to publicize a RFQ. See Tex. Loc. Gov't Code Ann.
§ 25.029 (West 2008); Austin City Charter, Art. V, §§ 1 (city manager chief administrative and
executive officer of the city), 2 (provides city manager's powers and duties). The city manager's
RFQ is consistent with her powers and duties and her expressed understanding of the bond history,
the budget allocation, and the ongoing steps in the process to relocate the animal shelter, which
history appellants do not dispute.

 Viewing the evidence in the light most favorable to appellants as the non-movants,
the statements in the city manager's e-mails and her subsequent conduct to proceed with the RFQ
may be evidence that the city manager misunderstood the city council's direction, but this evidence
does not raise a fact issue that the city council took an unauthorized action at the March 8, 2007,
meeting--one that was not included in its minutes or the notice. Dorsett, 164 S.W.3d at 661; see,
e.g., Cook v. City of Addison, 656 S.W.2d 650, 657 (Tex. App.--Dallas 1983, writ ref'd n.r.e.)
(city manager's expressions of intent not binding on city council; governmental body "may act only
in its official capacity"). We conclude that trial court did not err in granting summary judgment on
appellants' TOMA claim. Dorsett, 164 S.W.3d at 661. We overrule appellants' second issue.


Legislative Immunity


 In their third issue, appellants contend that the trial court erred in granting summary
judgment because the individual defendants do not have legislative immunity from appellants'
declaratory claims that they acted in excess of their authority under the city charter by authorizing
expenditures on a capital improvement project--the animal shelter's relocation-- that is not included
in the Comprehensive Plan. Specifically, appellants contend the city council acted ultra vires at its
October 11, 2007, meeting by authorizing the city manager to proceed with relocating the animal
shelter and at its October 18, 2007, meeting by approving a contract for architectural/site plan
services for the animal shelter location without first amending the Comprehensive Plan or the
Neighborhood Plan.

 Because we have concluded that the City was entitled to summary judgment on
the declaratory claims, that the City did not violate the city charter, the Comprehensive Plan, or
the Neighborhood Plan in deciding to proceed with its project to relocate the animal shelter, and
that amending the Comprehensive Plan and the Neighborhood Plan was not required, we need
not reach the alternative ground for summary judgment as to the individual defendants. See Krueger
v. Atascosa County, 155 S.W.3d 614, 621 (Tex. App.--San Antonio 2004, no pet.) (appellate courts
need not address grounds for summary judgment when affirming on alternative ground); see, e.g.,
Knott, 128 S.W.3d at 216. We overrule appellants' third issue.


CONCLUSION


 Because we conclude that the trial court did not err in granting summary judgment
in favor of the City, we affirm the trial court's judgment.

 

 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed: October 16, 2008
1. Because their interests align, we refer to appellees collectively as the "City" unless
specifically noted otherwise. In briefing to this Court, appellants name Marc Ott as a party in place
of Toby Futrell because Ott replaced Futrell as the city manager. We conclude that Futrell, as a party
sued in her individual capacity, remains the party on appeal. See Tex. R. App. P. 7.2 (substitution
of public officer automatic when sued in official capacity). 
2. Austin City Charter, art. X (2008).
3. Tex. Gov't Code Ann. § 551.041 (West 2004).
4. The Austin Tomorrow Comprehensive Plan can be found at Austin City Connection,
http://www.ci.austin.tx.us/zoning/com_plan.htm (last visited Sept. 26, 2008).
5. The agenda also included Item 61--"[a]pprove a resolution directing the City Manager to
report to City Council all available options regarding a new Animal Shelter and to refrain from
taking any action regarding the animal shelter without direction by Council." This item was
withdrawn at the city council meeting.
6. Austin Resolution No. 20071011-062 reads:


 WHEREAS, the current location of the 50 year-old Town Lake Animal Center
(TLAC) is experiencing limited capacity, lack of expandability and continuing
flooding, and,

 

 WHEREAS, the voters of the City of Austin and animal welfare advocates and
professionals have called for a new animal center, and,

 

 WHEREAS, previous studies/reviews identified significant challenges and
constraints to salvaging the current shelter, and,

 

 WHEREAS, voters of the City of Austin approved in a 2006 bond election funding
for a new animal center, and,

 

 WHEREAS, there has been an extensive process and multiple briefings to the Bond-Election Citizen Advisory Committee, the Bond Oversight Committee, the Austin
City Council, and, the Public Health and Human Services Subcommittee, regarding
a location for the new animal center, and, 

 

 WHEREAS, an alternative site for a possible new animal center has been identified,
and, NOW, THEREFORE,

 

 BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF AUSTIN

 

 That the City Council directs the City Manager to proceed with the planning of the
new animal center at 7201 Levander Loop, Austin, TX.


Austin, Tex., Resolution No. 20071011-062 (Oct. 11, 2007).


 
7. The e-mails between the city manager and representatives of Fix Austin and the Old West
Austin Neighborhood Association were from March 19, 2007, to March 27, 2007, and reflect that
city council members were copied.
8. For example, policy 424.3 states "Develop a public facility plan to coordinate municipal
service yard operations and designate municipal office locations." See Comprehensive Plan,
Chapter 4, Page 59. The City contends that the elements found in section 5 of the city charter do not
apply to the Comprehensive Plan because the current version of the city charter was enacted after
the Comprehensive Plan. See Austin City Charter, art. X, § 7 ("Any comprehensive plan or element
or portion thereof adopted pursuant to the authority of Article X of this Charter or other law, but
prior to the effective date of this amendment shall continue to have such force and effect as it had
at the date of its adoption and until appropriate action is taken to adopt a new comprehensive plan or
element or portion thereof as required and authorized by this amendment."). Because we conclude
the Comprehensive Plan generally addresses the elements in section 5, we need not address the
City's argument as to the applicability of the current city charter to the Comprehensive Plan.
9. Relying in part on Fernandez v. City of San Antonio, 158 S.W.3d 532
(Tex. App.--San Antonio 2004, no pet.), the City contends that the Comprehensive Plan
and the Neighborhood Plan are merely guides for city decision-makers while zoning regulations
control the actual development of property. Appellants contend Fernandez is distinguishable
because the plans at issue in that case were no longer in effect. See id. at 534. In Fernandez, a
neighborhood association and several landowners brought suit against the City of San Antonio and
several developers contending that a planned development violated the neighborhood plan that was
an addendum to the neighborhood planning component of San Antonio's master plan. Id. at 533-34. 
Our sister court concluded that summary judgment was sustainable on the ground that the plans had
expired. Id. at 534. But, the court also found further support for summary judgment on the ground
that the neighborhood plan was "merely advisory and not binding on the City" relying on language
employed in the plan; "the plan [was] self-described as providing 'guidelines' to the City." Id. The
court noted that "even the City's master plan, of which the Neighborhood Plan was a component,
[was] merely a guide for rezoning requests rather than a mandatory restriction on the City's authority
to regulate landuse." Id. The court also raised issue with the propriety of delegating the City's
legislative power by allowing individuals to impose their desires on a city's authority to regulate land
use issues. Id. at 535 (citing Texas Boll Weevil Eradication Found., Inc. v. Lewellen, 952 S.W.2d
454, 469 (Tex. 1997)). Because we conclude that the animal shelter's relocation to the HHSD
campus is consistent with the Comprehensive Plan and the Neighborhood Plan, we need not address
the City's additional argument as to the advisory nature of comprehensive and neighborhood plans.

10. At oral argument, appellants seemed to argue that the e-mails themselves violated the
TOMA. Appellants' pleadings state, as to the City's TOMA violation, "Plaintiffs ask the Court to
declare void any vote by the Austin City Council, including but not limited to its March 8, 2007
Agenda 2 and 3 vote, that the City claims was a Council authorization to spend bond funds for
the animal shelter at any location other than its current location." The City does not claim that the
e-mails were a "vote" to relocate the animal shelter; the City's "claim" is that the city council voted
to relocate the animal shelter at its October 11, 2007, meeting. In any event, because appellants did
not raise this additional TOMA allegation below, appellants have not preserved it as an issue for our
review. Tex. R. App. P. 33.1.
11. Appellants included other e-mails--an e-mail from an attendee of an animal advisory
commission meeting that occurred in January 2007, to Dunkerley reporting on the meeting, and
a series of e-mails between a Fix Austin representative and Dunkerley from October 2006 to
January 2007--in their response to the City's motion for summary judgment, but they do not provide
argument as to these additional e-mails in their second issue. In any event, we conclude these other
e-mails do not create a fact issue that the city council violated the TOMA at its March 8, 2007,
meeting.