# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00226-CV

**PODER, Govalle/Johnston Terrace Neighborhood Planning Team, Old West Austin Neighborhood Association and Fix Austin, Appellants**

**v.**

**City of Austin; Mayor of Austin, The Honorable Will Wynn; Mayor Pro Tem Betty Dunkerley; Council Member Mike Martinez; Council Member Jennifer Kim; Council Member Lee Leffingwell; Council Member Brewster McCracken; Council Member Sheryl Cole; et al., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-07-003351, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this suit, appellants PODER (People Organized in the Defense of the Earth and her Resources), Govalle/Johnston Terrace Neighborhood Planning Team, Old West Austin Neighborhood Association, and Fix Austin challenge the relocation of the City of Austin's animal shelter from Central Austin to the Health and Human Services Department campus ("HHSD campus") in East Austin. Appellants appeal from a summary judgment in favor of appellees the City of Austin; Mayor of Austin, the Honorable Will Wynn; Mayor Pro Tem Betty Dunkerley; Council Member Mike Martinez; Council Member Jennifer Kim; Council Member Lee Leffingwell; Council Member Brewster McCracken; Council Member Sheryl Cole; and City Manager

Toby Futrell that upheld the City's decision to proceed with relocating its animal shelter to the HHSD campus.[1]

In three issues, appellants contend the trial court erred in granting summary judgment because (i) the City violated Article X of the Austin City Charter[2] in that the animal shelter relocation was required to be included in the City's comprehensive plan and it was not; (ii) the city council violated the Texas Open Meetings Act ("TOMA")[3] by taking action on the animal shelter relocation without including that action in its meeting notice and minutes; and (iii) members of the city council, the mayor, and the city manager do not have legislative immunity. Because we conclude the trial court did not err in granting summary judgment in the City's favor, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The HHSD campus is located in the Johnston Terrace neighborhood in East Austin. The Austin Tomorrow Comprehensive Plan ("Comprehensive Plan"), the neighborhood plan for the Johnston Terrace neighborhood, and city zoning ordinances address the HHSD campus's future development and uses. The Comprehensive Plan, adopted in the late 1970s, is the City's

---

[1] Because their interests align, we refer to appellees collectively as the "City" unless specifically noted otherwise. In briefing to this Court, appellants name Marc Ott as a party in place of Toby Futrell because Ott replaced Futrell as the city manager. We conclude that Futrell, as a party sued in her individual capacity, remains the party on appeal. *See* Tex. R. App. P. 7.2 (substitution of public officer automatic when sued in official capacity).

[2] Austin City Charter, art. X (2008).

[3] Tex. Gov't Code Ann. § 551.041 (West 2004).

2

comprehensive plan for future development and growth. *See generally* Comprehensive Plan (1979).[4]

Its policies are implemented in the City's land development code. Austin, Tex., Land Dev. Code § 25-1-1 (2008) ("This title implements the planning policies of the Comprehensive Plan and shall be construed to achieve its purposes."). The Comprehensive Plan includes neighborhood plans adopted by the city council, and, in March 2003, the city council adopted the Govalle/Johnston Terrace Combined Neighborhood Plan ("Neighborhood Plan") as an element of the Comprehensive Plan. Austin, Tex., Ordinance No. 030327-12 (Mar. 27, 2003). The Neighborhood Plan includes a narrative that has an "Adopted Future Land Use Map" listing "civic use" for the HHSD campus and specific suggestions for the HHSD campus's future development and use:

> This property is now owned by the City of Austin through the Health and Human Services Department. A large portion of the northern part of this site is affected by a power line that runs through the property. This power line constitutes a significant impediment to development of this part of the property.
>
> Neighborhood stakeholders suggested that if it was possible to re-route these power lines that this site might be appropriate for residential development. Residential development that was affordable and available to local families is supported by this plan.
>
> If it is not possible to re-route the power line, other suggestions for this property were recreational uses including:
>
> •     Playing fields—since the cessation of the soccer on the "informal" field at Oak Springs, there is a lack of places for soccer in this area. A baseball diamond was also mentioned as another form of playing field that would be appropriate;
> •     Small walking trail;
> •     Playground.

---

[4] The Austin Tomorrow Comprehensive Plan can be found at Austin City Connection, http://www.ci.austin.tx.us/zoning/com_plan.htm (last visited Sept. 26, 2008).

3

At the same time, the city council adopted the Neighborhood Plan, it adopted ordinances re-zoning and changing the zoning map for the Govalle and Johnston Terrace neighborhoods. In the ordinance for the Johnston Terrace neighborhood, the HHSD campus is zoned "P-NP." Austin, Tex., Ordinance No. 030327-11b (Mar. 27, 2003). The "P" designates public use, and the "NP" designates zoning in conjunction with a neighborhood plan. Austin, Tex., Land Dev. Code § 25-2-32 (E)(5) ("P"), (F)(19) ("NP") (2008).

In November 2006, Austin voters approved a bond package that included, in Proposition 7, authorization for the City to issue and sell general obligation bonds and notes "for the public purposes of constructing, renovating, improving, and equipping public safety facilities, including, without limitation, . . . an animal shelter, and other related facilities and acquiring land and interests in land and property necessary to do so." *See* Austin, Tex., Ordinance No. 20060608-084, Part 1 (June 8, 2006) (city council established bond proposition language). The City's animal shelter has been at the same location in Central Austin from the mid-1950s and "is difficult to maintain because the infrastructure has deteriorated, there have been problems with flooding, the building has an obsolete design, and lacks state of the art technology." "Bond brochure language" for Proposition 7 included the HHSD campus as a proposed location for a new animal shelter.

The agenda for the city council meeting on March 8, 2007, included two items related to the bond package and Proposition 7. Item 2 was a recommendation for a resolution to declare the City's intent to reimburse itself from the November 2006 bonds. Item 3 was a recommendation to amend the City's budget ordinance for the fiscal year 2006-2007 to include the funds from the bond election. At the March 8, 2007, meeting, the city council approved both items—a resolution to

4

reimburse the City from the bond package and an ordinance amending the budget to include the funds from the bond election. The ordinance amended the "Fiscal Year 2006-2007 Health and Human Services Capital Budget . . . to increase appropriations for November 2006 Proposition 7 project expenditures by an amount of $850,000 related to an animal shelter facility." Austin, Tex., Ordinance No. 20070308-003, Part 6 (Mar. 8, 2007).

Appellants filed suit against the City on October 1, 2007, seeking declaratory and mandamus relief, contending that the City had violated the TOMA at the March 8, 2007, city council meeting by failing to post notice of its purported actions at the meeting to amend the Neighborhood Plan and "to authorize city funds to be used to move the shelter from its current location." Appellants also sought declarations that any "purported vote" by the city council to amend the Neighborhood Plan was void, and that the City may not amend the Neighborhood Plan without complying with the neighborhood planning procedures and posting notice of the city council's consideration of such amendment.

The city council addressed the animal shelter's relocation to the HHSD campus at a city council meeting on October 11, 2007. The agenda for this meeting included Item 62—"[a]pprove a resolution designating the location for the new animal center and directing the City Manager to proceed with planning for the facility."[5] At the meeting, city staff presented "problems" with the animal shelter's current location and the proposal for the location of a new

---

[5] The agenda also included Item 61—"[a]pprove a resolution directing the City Manager to report to City Council all available options regarding a new Animal Shelter and to refrain from taking any action regarding the animal shelter without direction by Council." This item was withdrawn at the city council meeting.

5

animal shelter at 7201 Levander Loop "known as the Health and Human Services Campus." The public also offered comment. The city council voted to approve a resolution that "the City Council directs the City Manager to proceed with the planning of the new animal center at 7201 Levander Loop, Austin, TX." Austin, Tex., Resolution No. 20071011-062 (Oct. 11, 2007).[6] A week later at

---

[6] Austin Resolution No. 20071011-062 reads:

**WHEREAS**, the current location of the 50 year-old Town Lake Animal Center (TLAC) is experiencing limited capacity, lack of expandability and continuing flooding, and,

**WHEREAS**, the voters of the City of Austin and animal welfare advocates and professionals have called for a new animal center, and,

**WHEREAS**, previous studies/reviews identified significant challenges and constraints to salvaging the current shelter, and,

**WHEREAS**, voters of the City of Austin approved in a 2006 bond election funding for a new animal center, and,

**WHEREAS**, there has been an extensive process and multiple briefings to the Bond-Election Citizen Advisory Committee, the Bond Oversight Committee, the Austin City Council, and, the Public Health and Human Services Subcommittee, regarding a location for the new animal center, and,

**WHEREAS**, an alternative site for a possible new animal center has been identified, and, **NOW**, **THEREFORE**,

**BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF AUSTIN**

That the City Council directs the City Manager to proceed with the planning of the new animal center at 7201 Levander Loop, Austin, TX.

Austin, Tex., Resolution No. 20071011-062 (Oct. 11, 2007).

its October 18, 2007, meeting, the city council authorized the "negotiation and execution of a professional services agreement . . . for architectural services for the new animal center."

In January 2008, appellants amended their petition to add the mayor, mayor pro tem, city council members, and the city manager as defendants in their individual capacities and additionally sought to have the city council's actions at its October 11 and October 18 meetings concerning the animal shelter relocation declared void. Appellants also filed a motion for summary judgment against the City seeking a declaration that the city council's actions to relocate the animal shelter to the HHSD campus were unlawful and violated the city charter and planning ordinances because the proposed animal shelter is omitted from the Comprehensive Plan as amended by the Neighborhood Plan, is inconsistent with the Neighborhood Plan, and falls within the definition of a "kennel" as a commercial, not civic, use. Appellants' summary judgment evidence included the city council's minutes from its meetings on March 27, 2003, October 11, 2007, and October 18, 2007, and the affidavit of Daniel Llanes, one of the original participants of the Govalle/Johnston Terrace neighborhood planning team. Llanes averred that the Health and Human Services Department informally asked the planning team in 2007 about relocating the animal shelter to the HHSD campus and that the planning team responded that the animal shelter should remain in West Austin and that it "wanted to see housing on [the HHSD campus] as included in the [N]eighborhood [P]lan." Llanes also averred that no amendment to the Neighborhood Plan for the relocation was proposed.

In March 2008, the City filed a competing motion for summary judgment on the ground that the city council's actions to relocate the animal shelter had not violated the city

charter, the Comprehensive Plan, or the Neighborhood Plan. The City also sought summary judgment on the grounds that the city council had not violated the TOMA by its notice or actions taken at its meeting on March 8, 2007, that the individual defendants had legislative immunity, and that appellants had not alleged a cause of action against the city manager. The City's summary judgment evidence included the city council agendas for the March 8, 2007, October 11, 2007, and October 18, 2007, meetings; the minutes from the March 8, 2007, and October 11, 2007, meetings; and the affidavits of Greg Guernsey, the director of neighborhood planning and zoning, and David Lurie, the director of the Health and Human Services Department. Guernsey averred that a "neighborhood plan serves as a way to advise the City about the concerns of the neighborhood and to provide a means to handle those concerns" and the "Future Land Use Map is the proposed land use for the property. It is used as a guide in making zoning decisions." Lurie averred to the current animal shelter's condition, the HHSD campus, and the city council meeting on October 11, 2007.

Both sides filed responses to the opposing parties' motions for summary judgment. Appellants' responses included additional evidence on their claim that the city council violated the TOMA—a request for statements of qualifications ("RFQ") by the city manager in May 2007 and e-mails. The RFQ was for the Health and Human Services Department for professional services for the animal shelter project—"replace existing facility and develop related infrastructure to support new Animal Shelter at the Health and Human Services Campus at 7201 Levander Loop." The e-mails included (i) an e-mail to Dunkerley reporting on an animal advisory commission meeting that occurred in January 2007; (ii) a series of e-mails exchanged between the city manager and representatives from Fix Austin and the Old West Austin Neighborhood Association after the

8

March 8, 2007, city council meeting;[7] and (iii) a series of e-mails between a Fix Austin representative and Dunkerley from October 2006 to January 2007 concerning the relocation of the animal shelter and when the city council would make a final decision.

After a hearing, the trial court granted summary judgment for the City "on all grounds asserted except the ground that the Plaintiffs have not alleged a cause of action against the City Manager." This appeal followed.

## ANALYSIS

In three issues, appellants challenge the trial court's grant of summary judgment in favor of the City. In their first issue, appellants contend that the trial court erred in granting summary judgment because the "Planning Article of the Austin City Charter prohibit(s) expenditures for a capital improvement project—in this case a multi-million dollar animal shelter—that is not even mentioned in the City's master plan or in the affected neighborhood plan." In their second issue, appellants contend that they produced competent summary judgment evidence that the city council violated the TOMA at its March 8, 2007, meeting, precluding summary judgment in favor of the City on appellants' TOMA declaratory claim. In their third issue, appellants contend that "the members of the Austin City Council [do not] have legislative immunity from a suit for declaratory judgment that the Council members acted in excess of their authority under the

---

[7] The e-mails between the city manager and representatives of Fix Austin and the Old West Austin Neighborhood Association were from March 19, 2007, to March 27, 2007, and reflect that city council members were copied.

Austin City Charter by authorizing expenditures for a capital improvement project that is not included in the City's Comprehensive Plan."

### *Standard of Review*

We review the trial court's decision to grant summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a summary judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). In deciding whether there is a disputed material fact issue precluding summary judgment, we must take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661; *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). A defendant may establish its entitlement to summary judgment by disproving at least one element of each of the plaintiff's claims. *American Tobacco Co.*, 951 S.W.2d at 425. If the movant shows that it is entitled to judgment as a matter of law, the burden shifts to the nonmovant to present evidence to raise a material fact issue that precludes summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

When the material facts are not in dispute, both parties move for summary judgment, and the district court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004). Where the trial court does not specify the grounds for its

summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review is meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

Statutory interpretation is a question of law and is properly resolved by summary judgment. *City of Plugerville v. Capital Metro. Transp. Auth.*, 123 S.W.3d 106, 109 (Tex. App.—Austin 2003, pet. denied). We review matters of statutory construction *de novo*, and our primary goal is to determine and give effect to the legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). We begin with the plain language of the statute at issue and apply its common meaning. *Id*. Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). In construing city charters and municipal ordinances, we use the same rules as we do when construing statutes. *Board of Adjustment of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002); *Hammond v. City of Dallas*, 712 S.W.2d 496, 498 (Tex. 1986); *City of Austin v. Hyde Park Baptist Church*, 152 S.W.3d 162, 165-66 (Tex. App.—Austin 2004, no pet.).

### *The City Charter, Comprehensive Plan, and Neighborhood Plan*

In their first issue, appellants contend that the City violated Article X of the city charter because the "capital improvement project for relocating the animal shelter was required to be included in the City's comprehensive [plan] and it was not included, therefore, the City lacked authority to proceed with the relocation project." Appellants rely on the facts that "the animal shelter program and the capital improvement, public facilities project for relocating the animal shelter are

11

not mentioned anywhere in the City's Comprehensive Plan," the Neighborhood Plan "contained specific use expectations for use of [the HHSD campus] which do not include and are inconsistent with use as an animal shelter," and the city council has not held a hearing to amend the Comprehensive Plan or the Neighborhood Plan.

The Comprehensive Plan, per the city charter, requires amendment when physical development conflicts with the plan:

> The Charter states further that no physical development in the city can be undertaken or authorized which it is in conflict with the master plan unless the plan is duly amended as recommended by the Planning Commission and approved by the City Council.

Comprehensive Plan, Chapter 1, Page 3. The City also has a procedure for amending a neighborhood plan. Austin, Tex., Ordinance No. 030605-53, Part 4 (June 5, 2003) (amendment to procedure to amend a neighborhood plan); Ordinance No. 030320-23 (Mar. 20, 2003) (procedure to amend a neighborhood plan). Reasons for amending a neighborhood plan include "because of a mapping or textual error or omission made when the original plan was adopted or during subsequent amendments." Austin, Tex., Ordinance No. 030320-23, Part 8. The City has not sought to amend the Comprehensive Plan or the Neighborhood Plan, as part of its efforts to relocate its animal shelter; the issue then is whether the animal shelter's relocation conforms and is consistent with the Comprehensive Plan and Neighborhood Plan so that amendment was not required.

Appellants rely on sections one, five, and six of Article X of the city charter to support their position that the project to relocate the animal shelter must be specifically included in

12

the plans and that an amendment was required. Section one of Article X states the purpose and intent of comprehensive planning:

> It is the purpose and intent of this article that the city council establish comprehensive planning as a continuous and ongoing governmental function in order to promote and strengthen the existing role, processes and powers of the City of Austin to prepare, adopt and implement a comprehensive plan to guide, regulate and manage the future development within the corporate limits and extraterritorial jurisdiction of the city. . . .
>
> It is further the intent of this article that the adopted comprehensive plan shall have the legal status set forth herein, and that no public or private development shall be permitted, except in conformity with such adopted comprehensive plan or element or portion thereof, prepared and adopted in conformity with the provisions of this article.

Austin City Charter, art. X, § 1 (2008); *see also* Tex. Loc. Gov't Code Ann. § 213.002 (West 2008) (municipality may adopt comprehensive plan "for long-range development" and to "be used to coordinate and guide the establishment of development regulations").

Section five outlines the comprehensive plan's required elements:

> The Council shall adopt by ordinance a comprehensive plan, which shall constitute the master and general plan. The comprehensive plan shall contain the council's policies for growth, development and beautification of the land within the corporate limits and the extrajudicial jurisdiction of the city, or for geographical portions thereof including neighborhood, community or areawide plans. The comprehensive plan shall include the following elements: (1) a future land use element; (2) a traffic circulation and mass transit element; (3) a wastewater, solid waste, drainage and potable water element; (4) a conservation and environmental resources element; (5) a recreation and open space element; (6) a housing element; (7) a public services and facilities element, which shall include but not be limited to a capital improvement program; (8) a public buildings and related facilities element; (9) an economic element for commercial and industrial development and redevelopment; and (10) health and human service element.

13

> The council may also adopt by ordinance other elements as are necessary or desirable to establish and implement policies for growth, development and beautification within the city, its extraterritorial jurisdiction, or for geographic portions thereof, including neighborhood, community, or areawide plans. . . .
>
> The several elements of the comprehensive plan shall be coordinated and be internally consistent. Each element shall include policy recommendations for its implementation and shall be implemented, in part, by the adoption and enforcement of appropriate land development regulations.

Austin City Charter, art. X, § 5 (2008).

Section six addresses the "legal effect" of an adopted comprehensive plan:

> Upon adoption of a comprehensive plan or element or portion thereof by the city council, all land development regulations including zoning and map, subdivision regulations, roadway plan, all public improvements, public facilities, public utilities projects and all city regulatory actions relating to land use, subdivision and development approval shall be consistent with the comprehensive plan, element or portion thereof as adopted. For purposes of clarity, consistency and facilitation of comprehensive planning and land development process, the various types of local regulations or laws concerning the development of land may be combined in their totality in a single ordinance known as the Land Development Code of the City of Austin.

*Id*. § 6 (2008).

Appellants rely on the language from these sections in Article X that a comprehensive plan "regulate[s] and manage[s] the future development," must be "internally consistent" and include "public improvements," "public facilities," and "a capital improvement program," and "all public improvements, public facilities . . . shall be consistent with the comprehensive plan" to contend that the City's project to relocate the animal shelter is required to be specifically included in the Comprehensive Plan as amended by the Neighborhood Plan. The city charter's plain

14

language, however, does not express an intent for the Comprehensive Plan to list specific public facilities projects, but for the plan to include general policies for such projects and that the projects conform and be consistent with the plan. *See City of San Antonio*, 111 S.W.3d at 25.

The Comprehensive Plan as amended by the Neighborhood Plan follows the city charter's guidelines. It states that it is a "general statement of policies" for future growth and development:

> [The plan] is the planning tool which indicates how citizens and their government leaders want the community to develop. . . . By definition, such a plan must be comprehensive, general and long range. . . . [I]t should be a general statement of policies and proposals but should not specify operational details. . . . [T]he plan should look beyond the pressing day-to-day decisions to the community's greater long range goals.

Comprehensive Plan, Chapter 1, Page 3. The Comprehensive Plan also generally provides policies, objectives, and goals as to the enumerated elements in section five of the city charter, including as to capital improvements. *See generally* Comprehensive Plan; *see id.*, Chapter 4, Pages 158-59.[8]

---

[8] For example, policy 424.3 states "Develop a public facility plan to coordinate municipal service yard operations and designate municipal office locations." *See* Comprehensive Plan, Chapter 4, Page 59. The City contends that the elements found in section 5 of the city charter do not apply to the Comprehensive Plan because the current version of the city charter was enacted after the Comprehensive Plan. *See* Austin City Charter, art. X, § 7 ("Any comprehensive plan or element or portion thereof adopted pursuant to the authority of Article X of this Charter or other law, but prior to the effective date of this amendment shall continue to have such force and effect as it had at the date of its adoption and until appropriate action is taken to adopt a new comprehensive plan or element or portion thereof as required and authorized by this amendment."). Because we conclude the Comprehensive Plan generally addresses the elements in section 5, we need not address the City's argument as to the applicability of the current city charter to the Comprehensive Plan.

The Neighborhood Plan similarly states its purpose is "to guide future development." Austin, Tex., Ordinance No. 030327-12, Exh. A, at 3. The Neighborhood Plan also states that "every action item listed in this plan will require separate and specific implementation," that "[a]pproval of the plan does not legally obligate the City to implement any particular action item," that it is a "guidance" document for City staff when reviewing projects and programs, and that it expresses "the direction the neighborhood desires to go." *Id*. at 80. We conclude that the Comprehensive Plan as amended by the Neighborhood Plan, consistent with the city charter's guidelines and directives, does not require the City's project to relocate its animal shelter to be expressly included within the plan. We turn then to the city charter's requirement that the project be consistent and conform with the Comprehensive Plan. Austin City Charter, art. X, §§ 1, 6.

Appellants contend that the animal shelter's relocation is inconsistent with the Comprehensive Plan because the use of the HHSD campus as an animal shelter is not included in the proposed uses of the HHSD campus in the Neighborhood Plan's text. Appellants rely on the amendment procedure to correct a "textual error or omission" in a neighborhood plan, *see* Austin, Tex., Ordinance No. 030320-23, Part 8, and on the specific proposed uses—residential or recreational—of the HHSD campus in the Neighborhood Plan. Austin, Tex., Ordinance No. 030327-12, Exh. A, at 47. The proposed uses, however, were expressly stated as "suggestions" from the "neighborhood stakeholders." *Id*. The Neighborhood Plan "recognizes" that the HHSD campus is among the properties in the neighborhood where "there is some room for future development and reuse of properties that are currently vacant or under-utilized." *Id*. at 44. The Neighborhood Plan then lists "suggestions" for future uses of the HHSD campus. *Id*. at 47. The City's ultimate decision

16

on how it will develop its property does not negate the neighborhood's expectations and "suggestions." In other words, requiring an amendment to the plan to revise the neighborhood's suggestions would be akin to requiring the neighborhood's consent. The neighborhood's expressed "suggestions" do not support an intent to bind the City's development and use of the HHSD campus to those suggested uses. *See City of San Antonio*, 111 S.W.3d at 25. We conclude that the animal shelter's omission from the neighborhood's suggested uses in the plan's text is not a "textual error" that would require amendment.

Appellants also contend that the animal shelter's relocation is inconsistent with the Comprehensive Plan as amended by the Neighborhood Plan because it is a commercial, not civic use, and that, therefore, the City was required to amend the plan. Appellants argue that an animal shelter falls within the commercial use classification "kennels." *See* Austin, Tex., Land Dev. Code § 25-2-4(B)(38) (2008). "Kennels use is the use of a site for boarding and care of dogs, cats, or similar small animals. This use includes boarding kennels, pet motels, and dog training centers." *Id*. Even if we were to conclude that an animal shelter is a type of "kennel," commercial uses do not include "those classified as . . . civic uses." *Id*. § 25-2-4(A) (2008). "Civic uses include . . . governmental functions, and other uses that are strongly vested with public or social importance." *Id*. § 25-2-6(A) (2008). Animal control, including a city's animal shelter, is a governmental function. *See* Austin, Tex., City Code, Art. 3 (2008); *cf.*, Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a)(33) (West 2005) (municipality liable under tort claims act for damages arising from its governmental functions, including animal control). The animal shelter, as a governmental function, falls within the civic use classification in the Neighborhood Plan.

The "Adopted Future Land Use Map" in the Neighborhood Plan lists "civic" use for the HHSD campus, *see* Austin, Tex., Ordinance No. 030327-12, Exh. A, at 37, and the HHSD campus's zoning is "P-NP"—for public use. Austin, Tex., Ordinance No. 030327-11b. The zoning ordinance adopted in conjunction with the Neighborhood Plan states, "Except as specifically restricted under this ordinance, the Property may be developed and used in accordance with the regulations established for the respective base districts and other applicable requirements of the City Code." *Id*., Part 5; *see also* Tex. Loc. Gov't Code Ann. §§ 211.004 (zoning regulations must be adopted in accordance with comprehensive plan), 213.005 (map of comprehensive plan does not constitute zoning regulations) (West 2008). The plain language of the Neighborhood Plan and the zoning ordinance allow civic uses, such as the animal shelter, on the HHSD campus. *See City of San Antonio*, 111 S.W.3d at 25.

We conclude that the City did not violate the city charter by proceeding with its project to relocate the animal shelter at the HHSD campus without amending the Comprehensive Plan or the Neighborhood Plan.[9] We overrule appellants' first issue.

---

[9] Relying in part on *Fernandez v. City of San Antonio*, 158 S.W.3d 532 (Tex. App.—San Antonio 2004, no pet.), the City contends that the Comprehensive Plan and the Neighborhood Plan are merely guides for city decision-makers while zoning regulations control the actual development of property. Appellants contend *Fernandez* is distinguishable because the plans at issue in that case were no longer in effect. *See id.* at 534. In *Fernandez*, a neighborhood association and several landowners brought suit against the City of San Antonio and several developers contending that a planned development violated the neighborhood plan that was an addendum to the neighborhood planning component of San Antonio's master plan. *Id*. at 533-34. Our sister court concluded that summary judgment was sustainable on the ground that the plans had expired. *Id*. at 534. But, the court also found further support for summary judgment on the ground that the neighborhood plan was "merely advisory and not binding on the City" relying on language employed in the plan; "the plan [was] self-described as providing 'guidelines' to the City." *Id*. The court noted that "even the City's master plan, of which the Neighborhood Plan was a component,

18

*Texas Open Meetings Act*

In their second issue, appellants contend that they produced competent summary judgment evidence that the city council violated the TOMA "for the secret decision on March 8, 2007, to authorize relocating the [animal] shelter." They rely on evidence that relocating the animal shelter was controversial, sparking "numerous protests, press conferences and editorials" and the notice and minutes for the March 8, 2007, meeting that the city council would consider and did consider budget allocations for the animal shelter—"Neither the posted meeting notice nor the meeting minutes of the Council's March 8, 2007, meeting disclosed that the Council was deciding to relocate the animal shelter to the East Austin site." Particularly because the decision was controversial, they contend that the notice was inadequate to permit the city council to decide to relocate the animal shelter at that meeting. Appellants also rely on e-mails from the city manager after the meeting and the city manager's action in "proceeding to develop and advertise an RFQ in May 2007 for architectural services for the animal shelter" at the HHSD campus, contending that this evidence shows "what the city manager understood" of the city council's "secret decision" to relocate the animal shelter and "that she had confirmed that understanding with members of the City Council." In particular, appellants rely on the city manager's statement in her e-mail dated

---

[was] merely a guide for rezoning requests rather than a mandatory restriction on the City's authority to regulate landuse." *Id*. The court also raised issue with the propriety of delegating the City's legislative power by allowing individuals to impose their desires on a city's authority to regulate land use issues. *Id*. at 535 (citing *Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 469 (Tex. 1997)). Because we conclude that the animal shelter's relocation to the HHSD campus is consistent with the Comprehensive Plan and the Neighborhood Plan, we need not address the City's additional argument as to the advisory nature of comprehensive and neighborhood plans.

March 20, 2007, that "[a]s the HHSD staff have communicated in multiple ways, the City Council has already voted on the new location for the TLAC," and her statement in an e-mail dated March 27, 2007, that she confirmed her understanding with city council members.[10]

Section 551.041 of the TOMA states, "A governmental body shall give written notice of the date, hour, place, and subject of each meeting held by the governmental body." Tex. Gov't Code Ann. § 551.041 (West 2004). The written notice must provide full and adequate notice of the subject matter of the governmental meeting:

> Our citizens are entitled to more than a result. They are entitled not only to know what government decides but to observe how and why every decision is reached. The explicit command of the statute is for openness at every stage of the deliberations.

*Acker v. Tex. Water Comm'n,* 790 S.W.2d 299, 300 (Tex. 1990); *see City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 466-67 (Tex. App.—Dallas 2007, no pet.) (TOMA requires notice to be "sufficiently specific to alert the general public to the topics to be considered at the upcoming meeting"); *Mayes v. City of De Leon*, 922 S.W.2d 200, 203 (Tex. App.—Eastland 1996, writ denied) ("The notice must provide full and adequate notice of the subject matter, particularly where the subject is of special interest to the public.").

---

[10] At oral argument, appellants seemed to argue that the e-mails themselves violated the TOMA. Appellants' pleadings state, as to the City's TOMA violation, "Plaintiffs ask the Court to declare void any vote by the Austin City Council, including but not limited to its March 8, 2007 Agenda 2 and 3 vote, that the City claims was a Council authorization to spend bond funds for the animal shelter at any location other than its current location." The City does not claim that the e-mails were a "vote" to relocate the animal shelter; the City's "claim" is that the city council voted to relocate the animal shelter at its October 11, 2007, meeting. In any event, because appellants did not raise this additional TOMA allegation below, appellants have not preserved it as an issue for our review. Tex. R. App. P. 33.1.

20

Appellants do not dispute that the city council's budgeted actions as to the animal shelter as reflected in the minutes from the March 8, 2007, meeting were properly noticed. Under the heading "Budget," Item 2 in the agenda for the meeting states:

> Approve a resolution declaring the City of Austin's official intent . . . to reimburse itself from the November 2006 Proposition 7 General Obligation Bonds to be issued for expenditures in the amount of $21,850,000 related to public safety facility projects.

Under the same heading, Item 3 of the agenda states:

> Approve an ordinance . . . amending the Fiscal Year 2006-2007 Health and Human Services Department Capital Budget . . . to increase appropriations by $850,000 for a[n] Animal Shelter facility.

The meeting minutes reflect that items 2 and 3 "were pulled for discussion" and that the city council voted to approve both items after discussion. The minutes do not reflect and the City does not contend that the city council voted to relocate the animal shelter at that meeting. The City contends that the vote to relocate the animal shelter occurred at the October 11, 2007, meeting. Appellants do not raise a TOMA violation as to the October 11, 2007, meeting. Based on this undisputed evidence, we conclude the City met its burden to disprove that the city council violated the TOMA at its March 8, 2007, meeting in its budgeting actions concerning the animal shelter. *See American Tobacco Co.*, 951 S.W.2d at 425.

The issue then is whether appellants raised a fact issue to preclude summary judgment. *See City of Houston*, 589 S.W.2d at 678. Appellants contend that the city manager's e-mails and subsequent action to proceed with the RFQ are "some admissible evidence that the

City Council did more than take the budget action reflected in their meeting notice and minutes." Appellants contend that the city manager's actions and e-mails show that the city council, facing controversy on the issue, took the additional "secret" action to decide to relocate the animal shelter without including the proposed action in the notice for the meeting or its decision in the minutes.[11]

Taken in context, the city manager's statement in her March 20, 2007, e-mail that the city council had already voted on the new location, however, does not support appellants' argument. In context, her statement recaps her understanding from a two-year history with public input on the bond approval for a new animal shelter. The city manager recites the two-year history of the process to relocate the animal shelter, including public hearings of the bond proposal and the inclusion of the HHSD campus as the proposed location in the bond public information:

> As the HHSD staff have communicated in multiple ways, the City Council has already voted on the new location for the TLAC. Here is the quick history . . .
>
> The staff put the new TLAC facility on the original needs assessment list at $23 million for rebuilding at the current site. Additional funds were in this number for a massive drainage retrofit and the costs of relocating animals during construction.
>
> The citizen bond advisory committee (CBAC) reviewed the site proposal, reviewed a consultant report including an assessment of the HHSD campus site, and cut the proposed funds back twice to the final recommended amount of $12 million. The CBAC met for over a year with multiple public hearings and monthly worksessions. The $12 million final recommendation to council was predicated on the site being

[11] Appellants included other e-mails—an e-mail from an attendee of an animal advisory commission meeting that occurred in January 2007, to Dunkerley reporting on the meeting, and a series of e-mails between a Fix Austin representative and Dunkerley from October 2006 to January 2007—in their response to the City's motion for summary judgment, but they do not provide argument as to these additional e-mails in their second issue. In any event, we conclude these other e-mails do not create a fact issue that the city council violated the TOMA at its March 8, 2007, meeting.

22

owned by the City with infrastructure in place and ultimately with the specific recommendation to place it at the HHSD site.

The site was communicated publicly to Council during the city council bond presentations and public hearings that preceded the council vote on the bond package. Copies of power point presentations are available that show the specific location of the TLAC.

The Council accepted the recommendation as part of the bond package, voted on the bond package and subsequently on the ballot language.

Subsequent public information and bond brochure language included specific reference to the selected site for the TLAC during the bond campaign.

After the successful bond election, a new citizen bond oversight committee (CBOC) was formed by Council and they reviewed the first year spending plan for the bonds, which included the 1st year design dollars for the TLAC. Their review included another identification/discussion of the proposed site, as this is needed to move forward with design. The CBOC recommended the first year spending plan to Council and Council approved those dollars and plans.

So, I guess the bottom line is that this discussion has been going on for over 2 years. Unless there is council direction to change course, we have a council direction to move ahead with implementation of the approved bond package, which includes the design of the TLAC at the HHSD site.

Appellants also place significance on the city manager's statement in her e-mail on March 27, 2007, that she had "followed up again with Council Members over the last week." That this statement addresses her perception of the city council's "direction of this project" from the bond package approval is clear from its context:

I know you may think we are fighting on this, but I am simply trying to be straight with you. The biggest disservice I could do to you would be to allow the project to keep moving ahead and not clearly present where we are, what we are doing and why. So, I am not going to repeat all the information from the 2 prior e-mail responses tonight where all the same people have been copied, instead just a few recaps:

23

1.  The legal opinion simply says that the Council is not bound by the brochure language. It does not say that Council did not made [sic] a decision, only that Council can change that decision because it is not locked in by the bond brochure language. Had the site been specified in the ballot language, Council would be locked in. That is a clarifier that we sought and shared with Council and others, so that everyone knew what their options were.

2.  Council as our policy making body can and does listen to all citizens and advocates, reserves the right to rethink a decision and has the ability to change the *direction of this project* with a vote of the council body. But they have not done that. *And I have followed up again with Council Members over the last week.*

3.  The Citizens Bond Advisory Committee, *after almost 2 years of a public process to create the 2006 bond package and through a specific recommendation by the Facilities Subcommittee, made a site-specific recommendation on the Animal Shelter. . . . Those recommendations were made by the CBAC and approved by Council, . . . All our subsequent bond election public information reflected those decisions*.

4.  Despite all the projects competing for funding, the recent approval of funds for staff to move forward on the design and engineering of the Shelter, which has to be site specific, in the few months remaining in the year one spending plan should clearly signal Council direction. If we still had no site, it would not have made sense to allocate precious funds to a project that could not get started without a site when other projects are ready to go. . . .

(emphasis added).

In this same e-mail, the city manager's reference and apparent reliance on the "recent approval of funds for staff to move forward on the design and engineering of the Shelter"—proceeding with the RFQ—also does not support appellants' contention that the city council violated the TOMA at its March 8, 2007, meeting. The "approval of funds" was undisputably included in the notice and minutes from the March 8, 2007, meeting—the allocation of funds from the bond package and the increase in appropriations in the HHSD's budget for the animal shelter. Appellants do not dispute that the city manager, whose duties are to administer the City's

day-to-day affairs, acted within her authority to publicize a RFQ. *See* Tex. Loc. Gov't Code Ann. § 25.029 (West 2008); Austin City Charter, Art. V, §§ 1 (city manager chief administrative and executive officer of the city), 2 (provides city manager's powers and duties). The city manager's RFQ is consistent with her powers and duties and her expressed understanding of the bond history, the budget allocation, and the ongoing steps in the process to relocate the animal shelter, which history appellants do not dispute.

Viewing the evidence in the light most favorable to appellants as the non-movants, the statements in the city manager's e-mails and her subsequent conduct to proceed with the RFQ may be evidence that the city manager misunderstood the city council's direction, but this evidence does not raise a fact issue that the city council took an unauthorized action at the March 8, 2007, meeting—one that was not included in its minutes or the notice. *Dorsett*, 164 S.W.3d at 661; *see, e.g., Cook v. City of Addison*, 656 S.W.2d 650, 657 (Tex. App.—Dallas 1983, writ ref'd n.r.e.) (city manager's expressions of intent not binding on city council; governmental body "may act only in its official capacity"). We conclude that trial court did not err in granting summary judgment on appellants' TOMA claim. *Dorsett*, 164 S.W.3d at 661. We overrule appellants' second issue.

### *Legislative Immunity*

In their third issue, appellants contend that the trial court erred in granting summary judgment because the individual defendants do not have legislative immunity from appellants' declaratory claims that they acted in excess of their authority under the city charter by authorizing expenditures on a capital improvement project—the animal shelter's relocation—that is not included in the Comprehensive Plan. Specifically, appellants contend the city council acted *ultra vires* at its

25

October 11, 2007, meeting by authorizing the city manager to proceed with relocating the animal shelter and at its October 18, 2007, meeting by approving a contract for architectural/site plan services for the animal shelter location without first amending the Comprehensive Plan or the Neighborhood Plan.

Because we have concluded that the City was entitled to summary judgment on the declaratory claims, that the City did not violate the city charter, the Comprehensive Plan, or the Neighborhood Plan in deciding to proceed with its project to relocate the animal shelter, and that amending the Comprehensive Plan and the Neighborhood Plan was not required, we need not reach the alternative ground for summary judgment as to the individual defendants. *See Krueger v. Atascosa County*, 155 S.W.3d 614, 621 (Tex. App.—San Antonio 2004, no pet.) (appellate courts need not address grounds for summary judgment when affirming on alternative ground); *see, e.g.*, *Knott*, 128 S.W.3d at 216. We overrule appellants' third issue.

## CONCLUSION

Because we conclude that the trial court did not err in granting summary judgment in favor of the City, we affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed: October 16, 2008